# 𝔖taunton

## DAN LEROY HALL v. COMMONWEALTH OF VIRGINIA.

September 8, 1948.

Record No. 3407.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Staples
and Miller, JJ.

*Hayden C. Covington, Thos. H. Stone, Grover C. Powell* and *Roy A. Swayze,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Ballard Baker, Special Assistant to the Attorney General,* for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

The accused, by this writ of error, seeks to reverse a judgment imposing a $5 fine upon him for trespass, on the ground that the conviction violates his right to freedom of speech, freedom of the press, freedom of assembly, and freedom of worship guaranteed to him by amendments I and XIV of the Constitution of the United States, sections 12 and 16 of the Constitution of Virginia, and section 34 of the Virginia Code, the Virginia Statute of Religious Freedom.

There is no substantial conflict in the testimony. The Monroe Prestwould Corporation owns a building located at 809 West Franklin Street, Richmond, Virginia, and known as Monroe Terrace Apartments. This is a twelve story structure containing 60 apartment units occupied by between two and three hundred people. The main entrance is a front door leading from the sidewalk to a large lobby on the ground floor. This lobby, the two elevators, the two stairways extending from the ground to the twelfth story, and the hallways are under the supervision and control of an attendant usually found at a desk placed on the far side of the front entrance to the lobby. Each of the sixty apartment units is entered from a hall, and on or near the door opening into each apartment is a button which, on being pressed, rings a doorbell inside the apartment.

The accused testified that he was a regularly ordained minister of Jehovah's Witnesses which is "an unincorporated body or force of missionary evangelists." This unincorporated body is under the control and direction of the Watchtower Bible and Tract Society, a corporation organized under the laws of New York and Pennsylvania. This corporation divides the United States into districts and assigns to each district an evangelistic worker. Richmond, Virginia, is in a district assigned to the accused who is directed to preach the beliefs of the corporation. He claimed to be doing this "under a God-given right to preach in public places, on the streets and sidewalks, from door to door, and whether in apartments or whether in the country or whether in the deepest jungles of Africa."

He had arranged to hold a public lecture at 8 P. M. on August 20, in Monroe Park, a public park across the street from Monroe Terrace. Between 7 and 8 P. M. on that day he and four other Jehovah's Witnesses entered Monroe Terrace for the purpose of calling upon the tenants in each apartment to deliver religious tracts and to invite the occupants to attend the lecture. Neither the accused nor his associates sought permission to visit the tenants. The accused was assigned to call upon the occupants of the tenth,

eleventh, and twelfth floors and used the elevator for that purpose. After he had completed his door-to-door calls upon these floors, he went outside the building where he was informed by a Mr. Cahoon, one of his associates, that the work had not been completed. He and Mr. Cahoon reentered the building and went to the desk, and according to the testimony of the accused, "Mr. Cahoon told them we were engaged in missionary work and were putting on a lecture in the park; the lady said to give her the handbills and she would see they were put out. About that time it was past seven and the lecture was to be at eight and Mr. Cahoon explained the obligation was upon our shoulders and besides, it would be the same as some Western Union boy delivering the handbills, that the obligation rests upon us and we explained this obligation was on us and that it was important for us to call upon the people. She said she could not give permission. He said, 'I am not asking for permission, and if you will not let the elevator girls take (us) *up* we will have to walk.'"

These two Jehovah's Witnesses, over the protest of the attendant, walked up the stairs and were ringing the different doorbells when Mr. G. O. Parrish, the manager of the apartments, stopped them and informed them that one of the rules governing the occupants of the building which had been adopted by the owner with the knowledge and acquiescence of the tenants, forbade any and all visitors from using the hallways to call upon the tenants unless their names were given and their intended visit was announced to the tenant from the desk in the lobby. To the explanation of this rule the accused said: "I wasn't interested and cut him off and said I would go away and leave him alone, that it was up to the people to tell us whether or not they wished to see us and if they don't want to be seen we don't bother them." The accused was told to leave the building and not return unless he was prepared to comply with the rule. He and his associates left the building, thus closing this incident.

The accused arranged another public lecture to be held

in Monroe Park on August 27, at 8 P. M. He and his associates reentered the apartment building. This time they stopped at the desk of the attendant who informed them that she could not let them go upstairs unless they complied with the rule regulating the calls of all visitors. To that the accused replied that he was not asking for permission but was going upstairs anyway and merely wanted to inform her that the strangers in the hallways were "just ministers doing their work" and for her to inform the occupants "not to be alarmed, that it was all right." The accused in answer to the following question, said: "Q. You went in there in defiance of what Mr. Parrish told you and the lady at the desk told you because you believed you knew the law and that you had a right to go in? A. Yes, I stand on the law of the land and the law of the Almighty."

While the five were using the upstairs hallways for the purpose of distributing their tracts and invitations to attend the public meeting, some of the tenants complained to the management. Shortly thereafter the accused was arrested, charged with unlawful trespass, and convicted as heretofore stated.

The statute under which the accused was prosecuted is Chapter 165, Acts of 1934 (sec. 4480-a, Michie's 1942 Code) which provides: "That if any person shall without authority of law go upon or remain upon the lands or premises of another, after having been forbidden to do so by the owner, lessee, custodian or other person lawfully in charge or possession of such land, he shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than twenty-five dollars."

The language of the statute is clear and unambiguous. Its provisions may be invoked only when a person has unlawfully entered or has remained upon the premises after he has been forbidden so to do by one lawfully in charge or in possession. The statute does not restrain the accused in any of his activities in the exercise of his religious beliefs; he may go from house to house distributing his pamphlets on the streets, sidewalks, or any other public place without

violating any provisions of the statute. The only purpose of this law is to protect the rights of the owners or those in lawful control of private property. It belongs to that class of statutes of which the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Richardson*, 313 Mass. 632, at p. 638, 48 N. E. (2d) 678, 146 A. L. R. 648, said: "The statute with which we are concerned in the present case cannot properly be construed to restrict the defendants from going from house to house in pursuit of their religious calling. It does not purport to do so. Its only purpose is to protect the rights of those in lawful control of property to forbid entrance by those whom they are unwilling to receive, and to exclude them if, having entered, those in control see fit to command them to leave. Properly applied the statute does not violate the Fourteenth Amendment to the Constitution of the United States."

Mr. Justice Black, in *Martin* v. *Struthers*, 319 U. S. 141, at p. 147, 63 S. Ct. 862, 87 L. Ed. 1313, speaking of this particular statute and other statutes of similar character, said: "Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off. General trespass after warning statutes exist in at least twenty states, while similar statutes of narrower scope are on the books of at least twelve states more."

█ We find nothing in the statute when properly applied which infringes upon any privilege or right guaranteed to the accused by the Federal Constitution.

The substance of the contention of the accused is that the entrance, the lobby, the hallways, the elevators, and the stairways within the Monroe Terrace Apartment Building are public ways; and the Fourteenth Amendment restrains the owner from adopting a rule or regulation prohibiting Jehovah's Witnesses from using the same for the purpose of distributing their religious tracts and beliefs just as it restrains the States and municipalities from adopting statutes and ordinances prohibiting similar use of highways, streets, sidewalks, and other public places.

This contention requires a careful analysis of the regulation attacked. The regulation has been in effect for more than fifteen years. No copy of the lease which the tenants are required to sign was produced in evidence. The regulation seems to be oral but, as the trial court found, "through custom and long usage" it has been approved by the tenants. It requires every visitor who enters the building to stop at the desk in the entrance lobby and have the clerk announce his arrival to the tenant. If the tenant informs the clerk that the visitor is expected, he is authorized to use the elevators and halls without question. If the visitor has no express invitation, the clerk calls the tenant by phone; and if the tenant wishes to see the visitor, he is directed how to find the apartment. If the tenant does not wish to see the visitor or is out, then the clerk so informs him and, for the time being, he is forbidden the use of the hallways or elevators. The effect of the rule is that the tenant determines whether or not the visitor is allowed to call.

It is unnecessary to analyze the more than 100 authorities cited by the accused in support of his argument. To do so would unduly lengthen this opinion and would serve no useful purpose. The new and broadened concept of the meaning of amendments I and XIV of the Constitution of the United States as conceived by five of the present nine members of the Supreme Court of the United States is expressed in several recent decisions. See the majority and minority opinions in *Murdock* v. *Pennsylvania*, 319 U. S. 105, 63 S. Ct. 870, 891, 87 L. Ed. 1292, 146 A. L. R. 81, *Martin* v. *Struthers*, 319 U. S. 141, 63 S. Ct. 862, 87 L. Ed. 1313, *Douglas* v. *Jeannette*, 319 U. S. 157, 63 S. Ct. 877, 882, 87 L. Ed. 1324; 28 Minn. Law Review 209.

It was held by the majority members of the Court in *Murdock* v. *Pennsylvania* that the Fourteenth Amendment to the Constitution prohibits any State or municipality from imposing a license tax as a condition to the free distribution or sale of religious tracts, pamphlets, or books upon the highways, streets, sidewalks, or other public places. The issue decided by the court is stated in this language: "We

are concerned, however, in these cases merely with one narrow issue. There is presented for decision no question whatsoever concerning punishment for any alleged unlawful acts during the solicitation. Nor is there involved here any question as to the validity of a registration system for colporteurs and other solicitors. The cases present a single issue—the constitutionality of an ordinance which as construed and applied requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities."

Mr. Justice Black, expressing the view of the majority in the case of *Martin* v. *Struthers, supra,* held that an ordinance which declared it to be unlawful for any person to go from door to door ringing doorbells and distributing to the occupants handbills, circulars, and other advertisements was an infringement upon freedom of speech, freedom of the press, and the exercise of religious liberty as guaranteed by the Fourteenth Amendment to the Constitution. In the course of the opinion, he said: "The dangers of distribution can so easily be controlled by traditional legal methods leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas."

The object of the regulation adopted by the Prestwould Corporation with the acquiescence of the tenants is to secure the safety, comfort, convenience, and privacy of all tenants, and to secure and promote the investment which the owners have made in the building by forbidding the use of the halls, elevators, and stairways to uninvited visitors and other unauthorized persons. The attendant in the lobby is made the servant—the doorkeeper—of each tenant, in that she is charged with the duty to announce every visitor and to determine if the particular tenant desires to receive him. If the visitor is unwelcome to the tenant, the attendant conveys that message to him. Each householder and not the owner exercises the right to determine whether he will receive the visitor, be he an acquaintance or a stranger.

Mr. Justice Jackson in an opinion concurring in the con-

clusion of the majority in *Douglas* v. *Jeannette*, 319 U. S. 166, gives a resume of the history of Jehovah's Witnesses, their beliefs, the type of pamphlets they distribute, and their connection with the Watchtower Bible and Tract Society. This opinion is a strong protest against the extent to which the majority of the court went in *Murdock* v. *Pennsylvania* and *Martin* v. *Struthers*, and their interpretation of the constitutional guarantee of freedom of speech, freedom of the press, freedom of assembly, and freedom of worship. The following excerpts are taken from this opinion, p. 174: "As individuals many of us would not find this activity (of Jehovah's Witnesses) seriously objectionable. The subject of the disputes involved may be a matter of indifference to our personal creeds. Moreover, we work in offices affording ample shelter from such importunities and live in homes where we do not personally answer such calls and bear the burden of turning away the unwelcome. But these observations do not hold true for all. The stubborn persistence of the officials of smaller communities in their efforts to regulate this conduct indicates a strongly held conviction that the Court's many decisions in this field are at odds with the realities of life in those communities where the householder himself drops whatever he may be doing to answer the summons to the door and is apt to have positive religious convictions of his own." In a footnote the following excerpt is quoted from Chafee, *Freedom of Speech in the United States* (1941) p. 407: "I cannot help wondering whether the Justices of the Supreme Court are quite aware of the effect of organized front-door intrusions upon people who are not sheltered from zealots and impostors by a staff of servants or the locked entrance of an apartment house."

At pages 178, 179, and 180 of the same opinion, Mr. Justice Jackson said: "Our difference of opinion cannot fairly be given the color of a disagreement as to whether the constitutional rights of Jehovah's Witnesses should be protected in so far as they are rights. These Witnesses, in common with all others, have extensive rights to proselyte and propagandize. These of course include the right to

oppose and criticize the Roman Catholic Church or any other denomination. These rights are, and should be held to be, as extensive as any orderly society can tolerate in religious disputation. *The real question is where their rights end and the rights of others begin* (emphasis added). The real task of determining the extent of their rights on balance with the rights of others is not met by pronouncement of general propositions with which there is no disagreement."

" . . . . A common-sense test as to whether the Court has struck a proper balance of these rights is to ask what the effect would be if the right given to these Witnesses should be exercised by all sects and denominations. If each competing sect in the United States went after the householder by the same methods, I should think it intolerable. If a minority can put on this kind of drive in a community, what can a majority resorting to the same tactics do to individuals and minorities? Can we give to one sect a privilege that we could not give to all, merely in the hope that most of them will not resort to it? Religious freedom in the long run does not come from this kind of license to each sect to fix its own limits, but comes of hard-headed fixing of those limits by neutral authority with an eye to the widest freedom to proselyte compatible with the freedom of those subjects to proselyting pressures."

The most recent expressions of the Supreme Court of the United States on this subject are found in *Marsh* v. *Alabama*, 326 U. S. 501, 66 S. Ct. 276, 90 L. Ed. 265, and *Tucker* v. *Texas*, 326 U. S. 517, 66 S. Ct. 274, 90 L. Ed. 274, both of which were decided by a divided court. The facts in *Marsh* v. *Alabama* were that Chickasaw, a town in the suburbs of Mobile, Alabama, was owned by the Gulf Shipbuilding Corporation; the property consisted of residential buildings, streets, sidewalks, sewers, and a block on which business places were situated. A deputy sheriff of Mobile county, paid by the company, served as the town policeman. The streets and sidewalks within the municipality had every appearance of the streets and sidewalks of any other town. The shopping districts "are accessible to and freely used by

the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation."

The corporation had a printed notice posted near the post office which read as follows: "This Is Private Property, and Without Written Permission, No Street, or House Vendor, Agent or Solicitation of Any Kind Will Be Permitted." A Jehovah's Witness stood on the sidewalk near the post office and was distributing religious tracts. She was warned that she could not do this without a permit and that no permit would be issued to her. She refused to leave and was arrested under a statute similar to the Virginia statute which makes it a crime to enter or to remain on the premises of another after having been warned not to do so. The Alabama Court of Appeals in affirming the judgment of conviction held that there was no irrevocable dedication of the sidewalk to the public and that, title being in a private corporation, no constitutional right was involved. Mr. Justice Black in holding that the corporation had no right to prohibit a Jehovah's Witness from distributing religious literature on the street, in the course of the opinion said: "Can those people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town? For it is the State's contention that the mere fact that all the property interests in the town are held by a single company is enough to give that company power, enforceable by a state statute, to abridge those freedoms.

"We do not agree that the corporation's property interests settle the question. The State urges in effect that the corporation's right to control the inhabitants of Chickasaw is coextensive with the right of a homeowner to regulate the conduct of his guests. We cannot accept that contention. Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become

circumscribed by the statutory and constitutional rights of those who use it."

The same reasoning was applied in *Tucker* v. *Texas*. The question involved was the right of Jehovah's Witnesses to distribute religious literature on the streets and sidewalks of Hondo Navigation Village which is owned by the United States under a Congressional program designed to provide houses for persons engaged in national defense activities. The Federal Public Housing Authority had placed the buildings and the village in charge of a manager. The village had all the appearance of a typical American town. The manager forbade a Jehovah's Witness to distribute her literature. She persisted and was convicted of trespass under the Texas statute. It was held that the Federal Public Housing Authority had no such power and that her conviction violated freedom of speech, freedom of the press, freedom of worship, and freedom of assembly.

While these Constitutional guarantees have been greatly extended by the Court's construction of amendments I and XIV, they have not been expanded to the extent that the householder or some member of his family must meet Jehovah's Witnesses at the door and accept or reject the religious literature offered. That, in substance, is just what Jehovah's Witnesses are demanding in this case.

The following syllabi in *People* v. *Bohnke*, 287 N. Y. 154, 38 N. E. (2d) 478, concisely described the ordinance involved and the precise point decided: "1. A village ordinance providing that, without the consent of the occupant, no person shall enter upon private residential property in such village for the purpose, among other things, 'of distributing any handbill, pamphlet, tract, notice or advertising matter,' but that it shall not apply to persons who have resided or maintained a place of business in such village for six consecutive months, is valid.

"2. On trial of defendants, on a charge of violating the ordinance by distributing religious pamphlets from door to door in the village, a defense that the ordinance is repugnant to the Fourteenth Amendment to the Federal Constitution

in that it deprives the defendants of their rights to freedom of religion, freedom of speech and the equal protection of the laws, was properly overruled. The ordinance merely regulates the right of entry onto private property and infringes no right of defendants since the Constitution does not guarantee them any right to go onto private property for the purpose of distributing pamphlets."[1]

The precise issue now under consideration was decided adversely to the contention of the accused in *The Watch-tower Bible, etc., Soc.* v. *Metropolitan Life Ins. Co.,* 297 N. Y. 339, 79 N. E. (2d) 433. There the facts were that the Metropolitan Life Insurance Company, as a private proprietor, owned in the Borough of the Bronx, New York City, a residential community called Parkchester which is said to be the largest of its kind in the world. It covers 129 acres, houses 12,000 family units, including a population of 35,000, in 171 adjoining and "interrelated" apartment houses. The buildings "are seven to twelve stories high. Through Parkchester run two public highways and in it are a number of private streets, lanes, and parks, as well as shops, offices, and automobile service stations, the latter operated by tenants of defendant. All of the apartments are held under written leases from defendant. Each such apartment lease binds the tenant to comply with such rules and regulations as the landlord shall from time to time deem necessary for the safety and care of the buildings, 'and the preservation of good order therein, as well as the comfort, quiet and convenience of other occupants of the building.'" The written regulation in the lease is as follows: "No person or group of persons shall enter any apartment building in the Parkchester development for the purpose of canvassing or of vending, peddling, or soliciting orders for any merchandise, device, book, periodical, pamphlet, circular, or for any printed, mimeographed, multigraphed or typewritten matter whatever; nor for the purpose of dis-

---

[1] The Supreme Court of the United States denied a petition for a writ of *certiorari* on April 13, 1942. Mr. Justice Black in a footnote to the majority opinion in *Martin* v. *Struthers* (319 U. S. 148) referred to this decision with apparent approval.

tributing any handbill, pamphlet, circular, tract, book, booklet, notice, or advertising matter; nor for the purpose of playing any phonograph or musical instruments in said apartment houses in connection with such canvassing, vending, peddling, solicitation or distribution; provided, however, that such canvassing, vending peddling, soliciting or distribution may be made with the consent of the Manager of the development or may be made within the apartment of any tenant if the prior written consent or invitation of such tenant shall have previously been furnished or exhibited to the Manager of the development."

Jehovah's Witnesses under the direction of the Watchtower Bible and Tract Society Incorporated, attempted to make the same use of the halls, elevators, and stairways of the apartment buildings, and for the same purpose, as they did of the passageways in the Monroe Terrace Apartments. A force of private guards, which the Metropolitan Life Insurance Company maintained, intercepted them when they entered the apartment houses and prevented them, by ejectment when necessary, from engaging in their preaching activities from door to door in the apartment buildings. The attorneys for the parties were unable to reach a satisfactory conclusion of the matter. In March, 1946, the Metropolitan Life Insurance Company took a written poll of its tenants to ascertain which of them desired to receive visitors from Jehovah's Witnesses. The answers of a very large majority of the tenants indicated that only about thirty of them desired to receive such visitors. These facts were communicated to counsel for the society together with the names of the tenants who desired the visitors; and the society was instructed that they might visit those tenants but no others.

The Watchtower Bible and Tract Society filed a bill for an injunction praying that the Metropolitan Life Insurance Company be enjoined from prohibiting them from making a door-to-door canvass within the apartment buildings. In the trial the full history of the society, its connection with Jehovah's Witnesses, and the type of literature and tracts

which revealed the beliefs and activities of the plaintiffs were developed.

■ Mr. Justice Pecora, the trial judge, in his opinion (69 N. Y. Supp. (2d) 385) recited the facts in some detail and described the type of literature and the organization and activities of the society.[2] All the Federal cases cited in the briefs filed in this case were cited in the briefs in the New York case. The trial court emphasised the fact that all of the Federal cases relied upon involved State statutes, municipal ordinances, or regulations (except *Marsh* v. *Alabama* and *Tucker* v. *Texas, supra*), and declared that the regulation of the Parkchester Apartment Houses was one adopted by the Metropolitan Life Insurance Company in its capacity as landlord; that the regulation was designed "to increase the safety, care, and cleanliness of the houses, to preserve good order therein, and to promote the comfort, quiet, and

---

[2] "Plaintiffs' literature also declares that all organized governments and their agencies are part of Satan's invisible government on earth. Yet they come before this court—which, according to their beliefs, is an instrument of Satan's government—and invoke its powers for their protection. The court, of course, recognizes that plaintiffs are entirely justified in seeking its protection in the exercise of rights which they claim to have under the constitution of our government, even though they regard that government as dominated by Satan.

"Instead of being chartered under our Religious Corporations Law, the plaintiff society is incorporated under our Membership Corporations Law. It claims to be a non-profit organization, and that its adherents are engaged in the 'charitable work' of preaching the gospel of the Kingdom of Almighty God. But it admits that it does not bestow or distribute any other form of public charity or philanthropy. The evidence shows that it owns and operates a large printing plant in Brooklyn, wherein its literature is printed. The society is fully reimbursed by its ministers or workers for the literature which they distribute to the public, and its gross income therefrom exceeds one million dollars annually, at least in recent years. Its ministers or workers for the most part distribute such literature to the public for sums or 'contributions' which net a substantial profit to them over and above the prices which they pay to the society for it.

"Notwithstanding such anomalies as may be evidenced in the avowals and activities of the plaintiffs, this court is inclined to credit them with sincerity in their protestations and professions of faith. It will pass no opinion, however, upon their soundness, for it is unnecessary to do so in order to decide the issues here raised. In the exercise of the rights of freedom of speech, of press and of worship, one may disseminate his views, no matter how unorthodox or abhorrent even they may seem to others."

convenience of their occupants." The right to prescribe the ordinance was given to the owner by the provisions of its written leases. Speaking to the point, the trial court declared: "It has long been established that the First Amendment to the Federal Constitution prohibits Congress from passing any law abridging the rights of free speech, of the press, and of worship; or the rights of the people to peaceably assemble and to petition the government for a redress of grievances; and that the Fourteenth Amendment prohibits a state from depriving any person of life, liberty or property without due process of law, and from making or enforcing any law abridging the privileges or immunities of citizens of the United States. But neither amendment adds anything to the rights of one citizen as against another, nor do they inhibit action by individuals in respect of their property.

". . . . Not one of those cases has held that Jehovah's Witnesses, or others having similar pursuits, have constitutional right to enter *within* an apartment house or multiple dwelling house, against the wishes of its owner or occupants. Those cases, it is true, have upheld their right to go upon the streets and to go from house to house and knock upon the doors *abutting* on the streets, in order to enable them to distribute their literature and to deliver their evangelical messages. It was even held that they had the right so to do in cases where the streets as well as the abutting houses were all privately owned by a corporation (*Marsh* v. *Alabama, supra*); and where they were owned by an agency of the United States Government (*Tucker* v. *Texas, supra*). But that august court has yet to rule that they have any constitutional right to go *beyond* the streets (whether publicly or privately owned) and *into* the abutting houses against the wishes of the owners or occupants. I do not think its adjudications thus far have destroyed the time-honored maxim that a man's home is his castle, nor any of its cherished implications.

"The inner hallways of apartment houses are not to be regarded in the same light as public roads, streets or high-

ways, even when the naked fee of the latter is privately owned. As was said in *Hague* v. *Committee for Industrial Organization* (307 U. S. 496, 513, 59 S. Ct. 954, 83 L. Ed. 1423): • "Wherever the title to streets and parks may rest, they have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens.

"Does the foregoing mean that the inner hallways of apartment houses, merely because they must be traversed from the street in order to reach the actual apartments wherein the tenants reside, likewise are burdened with rights which the public has in streets? Do such inner hallways constitute places of public assembly or for communicating thoughts one to another, or for the discussion of public questions? In the opinion of this court, the answer to those questions is clearly 'No.' "

On review by the New York Court of Appeals the judgment of the trial court, denying the Watchtower Bible and Tract Society Inc. injunctive relief and holding the regulation valid, was approved. On the appeal the plaintiff contended that the decision was controlled by the opinions in *Marsh* v. *Alabama* and *Tucker* v. *Texas* and that the effect of these decisions overruled the New York case of *People* v. *Bohnke*, 287 N. Y. 154, 38 N. E. (2d) 478. In rejecting that contention the court pointed out the distinction in the facts involved and quoted with approval its former holding in the *Bohnke Case* as follows: "It (the ordinance) does not prohibit pamphleteering. It regulates pamphlet distribution in private, not public, places, and gives no public officer any power of censoring the pamphlets or licensing, or refusing to license, their distribution. (See *Cox* v. *New Hampshire*, 312 U. S. 569, 574, 61 S. Ct. 762, 85 L. Ed. 1049, 133 A. L. R. 1396; *People* v. *Kuc*, 272 N. Y. 72, 74, 4 N. E. (2d) 939, 107 A. L. R. 1272; *Green River* v. *Fuller Brush Co.*, 65 F. (2d) 112, 88 A. L. R. 177.) It does not

infringe any of appellants' rights to the free exercise of their religion since it merely regulates their entry onto private property for the purpose of promoting their religious beliefs. It does leave to the pleasure of the individual householder the determination of whether or not pamphlets may be circulated on that householder's premises, but this infringes no right of appellants, since the Constitution does not guarantee them any right to go freely onto private property for such purposes." 79 N. E. (2d) at p. 435.

In concluding its discussion the New York court said: "Our purpose in thus briefly analyzing these decisions (*Marsh* v. *Alabama* and *Tucker* v. *Texas*) is to show that they do not (nor do any others of which we know) go nearly so far as appellants would have us go here. Parkchester, like Chickasaw, Alabama, and the Federal Housing community in Texas, is privately owned, but there the similarity as to facts ends. It is undisputed that this defendant has never sought in any way to limit the Witnesses' activities on the streets or sidewalks of Parkchester, some of which are privately, and some publicly, owned. The distribution which this defendant's regulation inhibits was not on streets, sidewalks or other public or quasi-public places, but inside of, and into, the several floors and inner hallways of multiple dwellings. Moreover, defendant's regulation did not absolutely debar these ministers from their visits in the buildings and their persuasions therein, since it allowed them, whenever a tenant so desired, and expressed his desire. We think the *Bohnke Case* is still the law and leaves valid the regulations of door-to-door calls along public streets. But, regardless of the *Bohnke* ruling, no case we know of extends the reach of the Bill of Rights so far as to prescribe the reasonable regulation, by an owner, of conduct inside his multiple dwelling. So holding, we need not examine the larger question of whether the pertinent clauses of the Constitutions have anything to do with rules made by any dwelling proprietors, governing conduct inside their edifices." 79 N. E. (2d) 436.

The only difference between the regulation adopted

by the Metropolitan Life Insurance Company and the regulation involved in this case is that, in the former, the regulation was written and incorporated in the leases, while in the case now under consideration the regulation was oral but adopted with the knowledge and consent of the tenants. The rule adopted by the Monroe Prestwould Corporation with the knowledge and consent of the tenants, regulating the conduct of visitors inside the building, is valid and reasonable and does not infringe upon any right or privilege guaranteed the accused by the Constitution of the United States, the Constitution of Virginia, or the Virginia Statute of Religious Freedom. This being true, when the accused and his associates refused to leave the premises on the request of the manager, they violated the provisions of Chapter 165, Acts of 1934.

The judgment of the trial court is affirmed.

*Affirmed.*