[648 NYS2d 630]

KENNETH TILLMAN et al., Respondents, v DISTRIBUTION SYSTEMS OF AMERICA, INC., Appellant, et al., Defendant.

Second Department, October 7, 1996

## APPEARANCES OF COUNSEL

*Berg & Duffy,* Mineola *(James P. Duffy, III, Dennis C. Carletta* and *Paul C. White* of counsel), for appellant.

*Kenneth J. Glassman,* New York City, for respondents.

*Rogers & Wells,* New York City *(David A. Schultz, Jerome L. Wilson* and *David E. McCraw* of counsel), for New York Newspaper Publishers Association, Inc., *amicus curiae.*

## OPINION OF THE COURT

BRACKEN, J. P.

We hold that neither a publisher nor a distributor has any constitutional right to continue to throw a newspaper onto the property of an unwilling recipient after having been notified not to do so *(see, City of Fredonia v Chanute Tribune,* 7 Kan App 2d 65, 638 P2d 347). "Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off * * * [The State may leave] the decision as to whether distributers *[sic]* of literature may lawfully call at a home where it belongs—with the homeowner himself. [The State] can punish those who call at a home in defiance of the previously expressed will of the occupant" *(Martin v Struthers,* 319 US 141, 147-148; *see also, City of Watseka v Illinois Pub. Action Council,* 796 F2d 1547, *affd* 479 US 1048; *Citizens for a Better Envt. v City of Park Ridge,* 567 F2d 689, 691; *Hall v Commonwealth,* 188 Va 72, 49 SE2d 369; *Alternatives for Cal. Women v County of Contra Costa,* 145 Cal App 3d 436, 449, 193 Cal Rptr 384; *City of Fredonia v Chanute Tribune,* 7 Kan App 2d 65, 638 P2d 347, *supra).* "[W]e perceive of no reason crucial to defendant's First Amendment rights that would require a householder to retrieve an unwanted paper from his lawn" *(City of Fredonia v Chanute Tribune,* 7 Kan App, *supra,* at 69, 638 P2d, *supra,* at 350).

The plaintiffs reside in Jericho, New York. The defendant Distribution Systems of America, Inc. (hereinafter DSA) is a domestic corporation which is in the business of distributing newspapers and other publications. The defendant Newsday, Inc. (hereinafter Newsday) is a domestic corporation which is the parent of DSA and which is itself a wholly owned subsidiary of the Times Mirror Company. Newsday admittedly avails itself of DSA's services in the making of deliveries. DSA is engaged in the distribution, on a saturation basis, of a publication known as "This Week".

According to the plaintiff Kenneth Tillman, the unsolicited newspapers, together with pull-out advertisements, were typi-

cally enclosed in a plastic bag and placed on Mr. Tillman's driveway; on other occasions, they were left on the front lawn or jammed in between the storm door and the front door of the house.

Beginning in 1990, Mr. and Mrs. Tillman made repeated requests to DSA, seeking to have these unwanted deliveries discontinued. According to Mr. Tillman, agents of DSA repeatedly promised to stop the deliveries. The Tillmans were eventually forced to resort to a lawyer, and the lawyer's requests were likewise met with assertions that the deliveries had been or would be stopped. Notwithstanding these assertions, it eventually became clear that DSA was either unwilling, as a matter of principle, or unable, as a matter of internal mismanagement, to comply with the Tillmans' request.

The present action was commenced in the Supreme Court, Nassau County, on or about June 22, 1994. The plaintiffs sought (1) an injunction restraining the defendants from delivering any unsolicited free newspapers or advertisements to their property, (2) a money judgment in the sum of $250,000 representing compensatory damages, (3) a money judgment in the sum of $250,000 based on an alleged violation of Oyster Bay Town Code § 24-2, and (4) punitive damages. An answer with several affirmative defenses was served on or about July 15, 1994, including the assertion that the defendants' conduct was "protected in whole or in part" by the Federal and State Constitutions.

On December 7, 1994, the plaintiffs made a motion for summary judgment. In support, Mr. Tillman submitted an affidavit attesting to the circumstances surrounding the delivery of the unwanted newspaper and advertisements to his home. He stated his grievance succinctly, asserting "[t]here is no reason that we have to clean up DSA's mess". He asserted that "[l]ittering on a public street is unlawful [and i]t should likewise be unlawful to litter on [his] property". The plaintiffs' attorney echoed these arguments, with some embellishment, asserting, for example, that the United States Supreme Court "has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property" *(Rowan v Post Off. Dept.,* 397 US 728, 737). The plaintiffs in effect requested summary judgment pursuant to this principle.

The circulation director for DSA submitted an affidavit in opposition. He asserted that DSA's policy is to "strive to honor stop delivery requests" and that it had been "trying to honor Mr. and Mrs. Tillman's request". Unable to rebut the evidence

produced by Mr. Tillman in support of his allegation that DSA's deliveries had continued despite repeated promises to the contrary, DSA's circulation director conceded that "to err is human" and chided Mr. Tillman for being "less than divine" in his reaction which, as DSA would have it, "seem[ed] totally out of proportion to the minor inconvenience that he and his wife may have experienced as a result of [unwanted] deliveries". He emphasized that, in relation to two million total deliveries, a rate of error in DSA's compliance with stop-delivery requests of only 1.5% would still mean "about 30,000 mistakes". This, DSA argued, was as "close to perfection as one can likely get".

The defendants' attorney submitted an affidavit in opposition referring to DSA's delivery of "First Amendment protected material". He also claimed that the plaintiffs had abandoned so much of their action as requested a money judgment.

By decision and order dated March 30, 1995, the Supreme Court granted the plaintiffs summary judgment on their first cause of action for a permanent injunction, and dismissed the second and third causes of action. In the judgment entered thereon, the court permanently enjoined DSA "from making deliveries of unsolicited newspapers and/or advertisements upon plaintiffs' property located at 21 Clinton Lane, Jericho, New York". This appeal followed.

The defendants argue on appeal that the material delivered by DSA is "non-commercial speech" (citing, *e.g.*, *Distribution Sys. v Village of Old Westbury*, 862 F Supp 950), and that the Supreme Court's injunction prohibiting the delivery of this material to the plaintiffs' home constitutes "State action" which limits such speech (citing, *e.g.*, *Shelley v Kraemer*, 334 US 1). Based on these and related arguments, the defendants argue that the granting of the plaintiffs' application for an injunction infringed on their constitutional right of free speech. We disagree. Assuming, without deciding, that the issuance of an injunction prohibiting a threatened trespass may be regarded as "State action", we conclude that such State action in this case did not infringe on the defendants' constitutionally protected freedom of speech or on the freedom of the press.

"The ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality, and none of the recognized exceptions includes any right to communicate offensively with another" *(Rowan v Post Off. Dept.,* 397 US 728, 737, *supra; see also, State v Casino Mktg. Group,* 491 NW2d 882 [Minn Sup Ct]; *H & L Messengers v City*

*of Brentwood,* 577 SW2d 444 [Tenn Sup Ct]; *Van Nuys Publ. Co. v City of Thousand Oaks,* 5 Cal 3d 817, 97 Cal Rptr 777). "An individual's right to communicate must be balanced against the recipient's right 'to be let alone' in places in which the latter possesses a right of privacy" *(People v Shack,* 86 NY2d 529, 536, quoting *Rowan v Post Off. Dept., supra,* at 736). In accordance with this general principle, it has been held that a vendor has no right under the Constitution or otherwise to send unwanted material into the home of another, even if the flow of valid ideas is impeded by such prohibition *(Rowan v Post Off. Dept., supra).* In *Rowan v Post Off. Dept. (supra,* at 736-737) the Court upheld a statute pursuant to which a person could require the removal of his name from a mailing list, stating in relevant part:

"In today's complex society we are inescapably captive audiences for many purposes, but a sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail. To make the householder the exclusive and final judge of what will cross his threshold undoubtedly has the effect of impeding the flow of ideas, information, and arguments that, ideally, he should receive and consider. Today's merchandising methods, the plethora of mass mailings subsidized by low postal rates, and the growth of the sale of large mailing lists as an industry in itself have changed the mailman from a carrier of primarily private communications, as he was in a more leisurely day, and have made him an adjunct of the mass mailer who sends unsolicited and often unwanted mail into every home. It places no strain on the doctrine of judicial notice to observe that whether measured by pieces or pounds, Everyman's mail today is made up overwhelmingly of material he did not seek from persons he does not know. And all too often it is matter he finds offensive. * * *

"The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property. See *Martin v. Struthers, supra;* cf. *Hall v. Commonwealth,* 188 Va. 72, 49 S.E.2d 369, appeal dismissed, 335 U.S. 875 (1948). In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer.

*"To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or*

*boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit;* we see no basis for according the printed word or pictures a different or more preferred status because they are sent by mail". (Emphasis added.)

As noted in *Rowan v Post Off. Dept.* (397 US 728, 737, *supra),* the Supreme Court has "traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property" (citing *Martin v Struthers,* 319 US 141, *supra).* Under this more "traditional" approach, the Court upheld an ordinance forbidding the entry onto private property by solicitors, hawkers, peddlers, itinerant merchants and transient vendors, in the absence of a prior invitation by the owners and occupiers *(Breard v Alexandria,* 341 US 622). The *Breard* Court stated, in part: "The First and Fourteenth Amendments have never been treated as absolutes. Freedom of speech or press does not mean that one can talk or distribute where, when and how one chooses. Rights other than those of the advocates are involved. By adjustment of rights, we can have both full liberty of expression and an orderly life" *(Breard v Alexandria,* 341 US 622, 642, *supra).*

The *Breard* Court went on to distinguish *Martin v Struthers* (319 US 141, *supra)* as having been "narrowly limited to the precise fact of the free distribution of an invitation to religious services" (341 US 622, 643, *supra).* In *Martin v Struthers* (319 US 141, *supra),* the Court had invalidated a local law which forbade the door-to-door distribution of handbills, and which had been used against Jehovah's Witnesses who had gone door to door with invitations to a religious meeting. Justice Black, writing for the Court in *Martin v Struthers (supra),* concluded that the local law infringed on the freedom to distribute information, but also acknowledged the propriety of leaving "with the homeowner himself" the power to decide "whether distributors of literature may lawfully call at a home" *(Martin v Struthers, supra,* at 148).

The *Breard* Court also distinguished *Marsh v Alabama* (326 US 501) and *Tucker v Texas* (326 US 517), cases which involved limitations on distributors of printed matter in "company and government-owned towns" *(Breard v Alexandria, supra,* at 643). The *Breard* Court concluded its analysis, upholding the ordinance, as follows: "It would be, it seems to us, a misuse of the great guarantees of free speech and free press to use those guarantees to force a community to admit the solicitors of

publications to the home premises of its residents. We see no abridgment of the principles of the First Amendment in this ordinance" *(Breard v Alexandria, supra,* at 645).

New York was one of the five States which, even before the *Breard* decision, had upheld the validity of this type of ordinance *(see, People v Bohnke,* 287 NY 154; *Breard v Alexandria,* 341 US 622, 628, n 6, *supra; see also, McCormick v City of Montrose,* 105 Colo 493, 99 P2d 969; *Watchtower Bible & Tract Socy. v Metropolitan Life Ins. Co.,* 297 NY 339; *City of Shreveport v Cunningham,* 190 La 481, 182 So 649; *City of Alexandria v Jones,* 216 La 923, 45 So 2d 79; *Green v Town of Gallop,* 46 NM 71, 120 P2d 619). In *People v Bohnke* (287 NY 154, *supra),* the Court saw nothing wrong with an ordinance which left to the discretion of the individual homeowner the decision whether to allow the circulation of pamphlets. The Court stated, in part, the following: "We hold the ordinance valid. It does not prohibit pamphleteering. It regulates pamphlet distribution in private, not public, places, and gives no public officer any power of censoring the pamphlets or licensing, or refusing to license, their distribution. (See *Cox v. New Hampshire,* 312 U.S. 569, 574; *People v. Kuc,* 272 N.Y. 72, 74; *Town of Green River v. Fuller Brush Co.,* 65 Fed. Rep. [2d] 112.) It does not infringe any of appellants' rights to the free exercise of their religion since it merely regulates their entry onto private property for the purpose of promoting their religious beliefs. It does leave to the pleasure of the individual householder the determination of whether or not pamphlets may be circulated on that householder's premises, but this infringes no right of appellants, since the Constitution does not guarantee them any right to go freely onto private property for such purposes" *(People v Bohnke, supra,* at 158-159).

As illustrated by the fact patterns presented in *Breard v Alexandria (supra)* and *People v Bohnke (supra),* local governments have, on several occasions, attempted to come to the aid of those homeowners who find it increasingly difficult to hold out, as their "castles" are besieged by mail, by phone, or, as in this case, by paper bombardment. Several ordinances, which to some extent regulate unsolicited distribution of written material, unsolicited mailings, unsolicited phone calls, or unsolicited commercial visits, have been challenged in the courts on First Amendment grounds *(see, e.g., Szefczek v Hillsborough Beacon,* 286 NJ Super 247, 668 A2d 1099 [prohibition of residential phone solicitation during certain hours without adequate do-not-call procedures]; *City of Fresno v Press Communications,* 31

Cal App 4th 32, 36 Cal Rptr 2d 456 [ordinance barring newspaper distribution when owner/occupant has left sign refusing delivery, or where previous distribution not collected]; *Chicago Tribune Co. v Village of Downers Grove,* 125 Ill 2d 468, 532 NE2d 821 [ordinance requiring solicitors to honor householder's "no solicitation" notice]; *Tipco Corp. v City of Billings,* 197 Mont 339, 642 P2d 1074 [ordinance barring door-to-door solicitations]; *Satinoff v Commonwealth,* 128 Pa Commw 93, 562 A2d 996 [conviction for violating antipeddling ordinance]; *City of Hillsboro v Purcell,* 306 Ore 547, 761 P2d 510 [antisolicitation ordinance]; *National Delivery Sys. v City of Inglewood,* 43 Cal App 3d 573, 117 Cal Rptr 791 [ordinance governing distribution of commercial literature]; *Toms Riv. Publ. Co. v Borough of Manasquan,* 127 NJ Super 176, 316 A2d 719 [action by newspaper publisher to enjoin antilitter ordinance]; *Van Nuys Publ. Co. v City of Thousand Oaks,* 5 Cal 3d 817, 97 Cal Rptr 777, *supra* [action by publisher to enjoin enforcement of antilitter ordinance]). In general, the ordinances challenged have proved susceptible to constitutional attack, often because of the overbreadth of the particular ordinance's reach, or because a classification contained in the ordinance violates the Equal Protection Clause. Typical of these cases is *Distribution Sys. v Village of Old Westbury* (862 F Supp 950, *supra),* the case most heavily relied upon by the defendants herein.

Many of these cases may seem to be at odds with *Breard v Alexandria* (341 US 622, *supra).* It may be that the validity of the holding in *Breard (supra)* must be reevaluated to the extent that this case may be said to rest upon the view that "commercial" speech is not entitled to protection. More recent case law has established that commercial speech is in fact protected, to some extent, by the Constitution *(see, Virginia Pharmacy Bd. v Virginia Consumer Council,* 425 US 748; *Central Hudson Gas & Elec. v Public Serv. Commn.,* 447 US 557). However, we do not believe that, in extending constitutional protection to commercial speech, in general, the Supreme Court necessarily eroded the privacy protection afforded to a landowner who, as an individual, has knowingly decided to bar a certain type of speech, commercial or otherwise, from his or her property *(see, e.g., Rowan v Post Off. Dept.,* 397 US 728, *supra).*

The most critical and fundamental distinction between the cases cited above, on the one hand, and the present case, on the other, is based on the fact that here we are not dealing with a government agency which seeks to preempt in some way the ability of a publisher to contact a potential reader;

rather, we are dealing with a reader who is familiar with a publisher's product, and who is attempting to prevent the unwanted dumping of this product on his property. None of the cases cited by the defendants stands for the proposition that the Free Speech Clause prohibits such a landowner from resorting to his common-law remedies in order to prevent such unwanted dumping. There is, in our view, nothing in either the Federal or State Constitutions which requires a landowner to tolerate a trespass whenever the trespasser is a speaker, or the distributor of written speech, who is unsatisfied with the fora which may be available on public property, and who thus attempts to carry his message to private property against the will of the owner *(see, Lloyd Corp. v Tanner,* 407 US 551).

In *Lloyd Corp. v Tanner (supra,* at 567-568), the Court held that the owner of a shopping center who consented to public access to his property for the purposes of shopping had no obligation to permit the distribution of handbills unrelated to the shopping center's function, stating:

"The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against *all* handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only. The Due Process Clauses of the Fifth and Fourteenth Amendments are also relevant to this case. They provide that '[n]o person shall * * * be deprived of life, liberty, or property, without due process of law.' 'There is the further proscription in the Fifth Amendment against the taking of' 'private property * * * for public use, without just compensation.'

"Although accommodations between the values protected by these three Amendments are sometimes necessary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, *this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only.* Even where public property is involved, the Court has recognized that it is not necessarily available for speaking, picketing, or other communicative activities" (emphasis added; *see also, SHAD Alliance v Smith Haven Mall,* 66 NY2d 496; *Bank of Stockton v*

*Church of Soldiers of Cross of Christ*, 44 Cal App 4th 1623, 52 Cal Rptr 2d 429; *Judlo, Inc. v Vons Cos.*, 211 Cal App 3d 1020, 259 Cal Rptr 624; *cf., New Jersey Coalition Against War in Middle East v J.M.B. Realty Corp.*, 138 NJ 326, 650 A2d 757).

The defendants' essential argument is that there is nothing a homeowner can do to stop the dumping on his or her property of pamphlets or newspapers, no matter how offensive they might be. The confines of the defendants' argument are not entirely clear; however, it is fair to say that there is no obvious limitation on the scope of their argument, with respect to either the quality or the quantity of the "protected material", so that, in theory, homeowners would have no recourse in the event they were subjected to the mass dumping of anything, including racist or antiSemitic rantings, which could claim First Amendment protection. Such landowners would either have to allow such unwanted newspapers to accumulate, or to expend the time and energy necessary to gather and to dispose of them. In our view, the defendants' freedom of speech can be fully protected without subjecting innocent homeowners to the potential for this kind of abuse.

The constitutional right of free speech does not correspond to the "right" to force others to listen to whatever one has to say. By the same token, the right to publish, distribute, and sell a newspaper does not correspond to the "right" to force others to buy or to read whatever one has written, or to spend their own time or money unwillingly participating in the distribution process by which a newspaper travels from the printing press to its ultimate destination, i.e., disposal. The State does all that it needs to do in order to protect the constitutional rights of a newspaper publisher when it refrains from censorship, and when it allows the distribution of the newspaper into the hands of the ultimate reader to proceed in accordance with the natural economic laws of a free market. The State need not, and in our opinion, should not, compel anyone to read, to buy, or even to touch, pick up, or handle a newspaper of which the individual in question wants to have no part. For these essential reasons, we affirm the order and judgment appealed from, which enjoined the defendants from continuing to deposit their newspaper on the plaintiffs' property.

O'BRIEN, RITTER and JOY, JJ., concur.

Ordered that the order and judgment is affirmed, with costs.