No. 401. MORA ET AL. *v.* MCNAMARA, SECRETARY OF DEFENSE, ET AL. C. A. D. C. Cir. Certiorari denied. MR. JUSTICE MARSHALL took no part in the consideration or decision of this petition. *Stanley Faulkner* and *Selma W. Samols* for petitioners. *Solicitor General Marshall* for respondents.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The petitioners were drafted into the United States Army in late 1965, and six months later were ordered to a West Coast replacement station for shipment to Vietnam. They brought this suit to prevent the Secretary of Defense and the Secretary of the Army from carrying out those orders, and requested a declaratory judgment that the present United States military activity in Vietnam is "illegal." The District Court dismissed the suit, and the Court of Appeals affirmed.

There exist in this case questions of great magnitude. Some are akin to those referred to by MR. JUSTICE DOUGLAS in *Mitchell* v. *United States,* 386 U. S. 972. But there are others:

I. Is the present United States military activity in Vietnam a "war" within the meaning of Article I, Section 8, Clause 11, of the Constitution?

II. If so, may the Executive constitutionally order the petitioners to participate in that military activity, when no war has been declared by the Congress?

III. Of what relevance to Question II are the present treaty obligations of the United States?

IV. Of what relevance to Question II is the Joint Congressional ("Tonkin Gulf") Resolution of August 10, 1964?

    (a) Do present United States military operations fall within the terms of the Joint Resolution?

    (b) If the Joint Resolution purports to give the Chief Executive authority to commit United States forces to armed conflict limited in scope only by his own absolute discretion, is the Resolution a constitutionally impermissible delegation of all or part of Congress' power to declare war?

These are large and deeply troubling questions. Whether the Court would ultimately reach them depends, of course, upon the resolution of serious preliminary issues of justiciability. We cannot make these problems go away simply by refusing to hear the case of three obscure Army privates. I intimate not even tentative views upon any of these matters, but I think the Court should squarely face them by granting certiorari and setting this case for oral argument.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE STEWART concurs, dissenting.

The questions posed by MR. JUSTICE STEWART cover the wide range of problems which the Senate Committee on Foreign Relations recently explored,[1] in connection with the SEATO Treaty of February 19, 1955,[2] and the Tonkin Gulf Resolution.[3]

Mr. Katzenbach, representing the Administration, testified that he did not regard the Tonkin Gulf Resolution to be "a declaration of war"[4] and that while the Resolution was not "constitutionally necessary" it was "polit-

---

[1] Hearings on S. Res. No. 151, 90th Cong., 1st Sess. (1967).

[2] [1955] 6 U. S. T. 81, T. I. A. S. No. 3170.

[3] 78 Stat. 384.

[4] Hearings on S. Res. No. 151, *supra*, n. 1, at 87.

ically, from an international viewpoint and from a domestic viewpoint, extremely important." [5]  He added:

> "The use of the phrase 'to declare war' as it was used in the Constitution of the United States had a particular meaning in terms of the events and the practices which existed at the time it was adopted . . . .
>
> "[I]t was recognized by the Founding Fathers that the President might have to take emergency action to protect the security of the United States, but that if there was going to be another use of the armed forces of the United States, that was a decision which Congress should check the Executive on, which Congress should support. It was for that reason that the phrase was inserted in the Constitution.
>
> "Now, over a long period of time, . . . there have been many uses of the military forces of the United States for a variety of purposes without a congressional declaration of war. But it would be fair to say that most of these were relatively minor uses of force . . . .
>
> .        .        .        .        .
>
> "A declaration of war would not, I think, correctly reflect the very limited objectives of the United States with respect to Vietnam. It would not correctly reflect our efforts there, what we are trying to do, the reasons why we are there, to use an outmoded phraseology, to declare war." [6]

The view that Congress was intended to play a more active role in the initiation and conduct of war than the above statements might suggest has been espoused by Senator Fulbright (Cong. Rec., Oct. 11, 1967, pp. 14683–14690), quoting Thomas Jefferson who said:

---

[5] *Id.,* at 145.

[6] *Id.,* at 80–81.

"We have already given in example one effectual check to the Dog of war by transferring the power of letting him loose from the Executive to the Legislative body, from those who are to spend to those who are to pay." [7]

These opposed views are reflected in the *Prize Cases*, 2 Black 635, a five-to-four decision rendered in 1863. Mr. Justice Grier, writing for the majority, emphasized the arguments for strong presidential powers. Mr. Justice Nelson, writing for the minority of four, read the Constitution more strictly, emphasizing that what is war in actuality may not constitute war in the constitutional sense. During all subsequent periods in our history— through the Spanish-American War, the Boxer Rebellion, two World Wars, Korea, and now Vietnam—the two points of view urged in the *Prize Cases* have continued to be voiced.

A host of problems is raised. Does the President's authority to repel invasions and quiet insurrections, do his powers in foreign relations and his duty to execute faithfully the laws of the United States, including its treaties, justify what has been threatened of petitioners? What is the relevancy of the Gulf of Tonkin Resolution and the yearly appropriations in support of the Vietnam effort?

---

[7] 15 Papers of Jefferson 397 (Boyd ed., Princeton 1958). In The Federalist No. 69, at 465 (Cooke ed. 1961), Hamilton stated:

"[T]he President is to be Commander in Chief of the army and navy of the United States. In this respect his authority would be nominally the same with that of the King of Great-Britain, but in substance much inferior to it. It would amount to nothing more than the supreme command and direction of the military and naval forces, as first General and Admiral of the confederacy; while that of the British King extends to the *declaring* of war and to the *raising* and *regulating* of fleets and armies; all which by the Constitution under consideration would appertain to the Legislature."

938

The London Treaty (59 Stat. 1546), the SEATO Treaty (6 U. S. T. 81, 1955), the Kellogg-Briand Pact (46 Stat. 2343), and Article 39 of Chapter VII of the UN Charter deal with various aspects of wars of "aggression."

Do any of them embrace hostilities in Vietnam, or give rights to individuals affected to complain, or in other respects give rise to justiciable controversies?

There are other treaties or declarations that could be cited. Perhaps all of them are wide of the mark. There are sentences in our opinions which, detached from their context, indicate that what is happening is none of our business:

> "Certainly it is not the function of the Judiciary to entertain private litigation—even by a citizen— which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region." *Johnson* v. *Eisentrager,* 339 U. S. 763, 789.

We do not, of course, sit as a committee of oversight or supervision. What resolutions the President asks and what the Congress provides are not our concern. With respect to the Federal Government, we sit only to decide actual cases or controversies within judicial cognizance that arise as a result of what the Congress or the President or a judge does or attempts to do to a person or his property.

In *Ex parte Milligan,* 4 Wall. 2, the Court relieved a person of the death penalty imposed by a military tribunal, holding that only a civilian court had power to try him for the offense charged. Speaking of the purpose of the Founders in providing constitutional guarantees, the Court said:

> "They knew . . . the nation they were founding, be its existence short or long, would be involved in war;

how often or how long continued, human foresight could not tell; and that unlimited power, wherever lodged at such a time, was especially hazardous to freemen. For this, and other equally weighty reasons, they secured the inheritance they had fought to maintain, by incorporating in a written constitution the safeguards which *time* had proved were essential to its preservation. Not one of these safeguards can the President, or Congress, or the Judiciary disturb, except the one concerning the writ of *habeas corpus*." *Id.*, 125.

The fact that the political branches are responsible for the threat to petitioners' liberty is not decisive. As Mr. Justice Holmes said in *Nixon* v. *Herndon,* 273 U. S. 536, 540:

"The objection that the subject matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years, since *Ashby* v. *White,* 2 Ld. Raym. 938, 3 *id.* 320, and has been recognized by this Court."

These petitioners should be told whether their case is beyond judicial cognizance. If it is not, we should then reach the merits of their claims, on which I intimate no views whatsoever.