114 N.J. Super. 408 (1971)
276 A.2d 595
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOAN KOLCZ, GERALDINE RIFINO, WALTER WEBER, PETER TEAGNO, SALLY RIZZO, POLONIA S. HENSEL, AGNES GIBBONS, PATRICK GIBBONS, FLORENCE CSIK, DEFENDANTS.
Superior Court of New Jersey, Middlesex County Court, Law Division (Criminal).
Decided April 7, 1971.
*409 Mr. Edward A. Podoleski, Assistant Prosecutor, for the State (Mr. Clinton E. Cronin, Acting Prosecutor, attorney for the State).
Mr. Bryan D. Garruto, for defendant (Messrs. Heilbrunn, Tabman, Finkelstein, Heilbrunn & Garruto, attorneys).
BACHMAN, J.D.C. (temporarily assigned).
This is an appeal of nine cases wherein the respective defendants were found guilty of violating N.J.S.A. 2A:170-31 (trespassing) by the Monroe Township Municipal Court.
The incident occurred on January 26, 1971, at about 2 P.M., at the Rossmoor Community, "a planned retirement village." What this means is that a developer using a parcel of land in Monroe Township laid out a community consisting of dwelling units, a church structure, a community hall and a small shopping area. To accomplish this the Township zoning ordinance was amended to accommodate such a plan. Upon the completion of the dwelling units they were advertised for sale to persons over the age of 52. Children may live with their parents, provided they are 18 years of age or older. A person wishing to occupy one of the dwelling units purchases a share or shares of stock in a corporation and signs a contract with that corporation granting him permission to live there; the contract is renewable at the option of the resident every three years.
Upon entering into occupancy the person buying an interest is given what is called a "welcome booklet." This contains, among other things, rules and regulations governing *410 the community. The pertinent part of this booklet reads as follows: "Solicitors and unauthorized persons will not be admitted to Rossmoor, New Jersey."
There is no municipal corporation in New Jersey by the name of Rossmoor, and the Rossmoor development with which we are concerned is located in and is part of Monroe Township.
Defendants are members of a group of citizens of the township who desire to change the present form of municipal government. They embarked upon this in the manner prescribed by the appropriate statute of New Jersey, i.e., by circulating a petition to be signed by the required number of local citizens. On January 26, 1971 this group, one of whom is a member of the municipal governing body, went to Rossmoor with the intention of asking the residents to sign their petition. They intended to do this by going from door to door of the dwelling units, ringing door bells and asking the residents if they care to sign the petition. Rossmoor is, apparently, in part surrounded by a wall and there are gates with security guards. Upon arriving, the nine defendants were met by the president of one of the holding companies and by a lawyer, their visit apparently having been anticipated. They informed these two gentlemen of their intention and were told that they could not enter upon the premises. Defendants nevertheless entered and went about their intended mission. Complaints were then signed in the municipal court by Donald Ankeny, president of Mutual No. 2 of New Jersey, which is the holding corporation for the land upon which defendants entered.
There is no question that these defendants were who they said they were, what they said they were, and doing what they said they were going to do. In other words, they were engaged in a bona fide activity, seeking signatures on their petition to change the form of government. There is testimony before this court that no political doorbell ringing had ever been tolerated in the Rossmoor community. On the other hand, the district committeeman of one of the *411 major political parties testified that each year he engaged in so-called door-bell ringing for one of two purposes: either to get his own petition signed so that his name would be on the ballot, or to advocate the candidacy of the national, state, county and local candidates of his party's choosing. He was told he could do it because he was a resident of Rossmoor. This court accepts the testimony of the committeeman as true, and rejects the contrary testimony. Further testimony showed there had been, at various times, an introduction of political candidates at social affairs held in the community, but the only candidates introduced were residents of the community.
Defendants, in their conversation with the representatives of the community on January 26, 1971 were informed that they could go to the community center and set themselves up in such a manner that residents could go to them if they desired to sign the petition.
During the course of the trial a representative of the Middlesex County Board of Elections testified. She said that the total number of registered voters in Monroe Township was 4,628 and of that number 990 resided within the confines of Rossmoor.
The aforementioned is the factual setting presented to this court and our decision is rendered solely in relation to the present circumstances.
In State v. Kirk, 84 N.J. Super. 151 (Cty. Ct. 1964), the court stated that under certain circumstances picketing on private property would not constitute a trespass. What the courts must do is balance the "equities" on an individual case basis.
The case of Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), involved an ordinance which made it unlawful for anyone distributing "handbills, circulars, or other advertisements" to ring a doorbell or otherwise summon homeowners to the door for the purpose of receiving such literature. A member of the Jehovah's Witnesses, who was convicted of violating the ordinance by *412 distributing pamphlets to homeowners concerning a religious meeting, had her conviction reversed by the U.S. Supreme Court. The court ruled the ordinance to be an unconstitutional invasion of the right of free speech and press. In weighing the conflicting interests of the defendant's civil rights, as well as the right of the individual homeowner to determine whether or not he wishes to receive defendant's message, against the interest of the community which attempted by this ordinance to insulate its citizens, whether they wanted such protection or not, the court concluded that the ordinance substituted the judgment of the community for the judgment of the individual householder and submitted the distributor to criminal punishment even though the intended recipient of the literature may have, in fact, been glad to receive it. Annotation, 35 A.L.R.2d 379 (1954) Justice Black, in his opinion, said:
For centuries it has been a common practice * * * for persons not specifically invited to go from home to home. * * * to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings. Whether such visiting shall be permitted has in general been deemed to depend upon the will of the individual master of each household, and not upon the determination of the community. * * * [319 U.S. at 141, 63 S.Ct. at 862, 87 L.Ed. at 1316]
The court stated that anyone familiar with political life realizes that campaigning door-to-door is one of the most accepted techniques of seeking popular support. Also, the circulation of nominating papers would be greatly handicapped if they could not be taken to the citizens in their homes. Furthermore, it was said that
The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors. * * * [319 U.S. at 147, 63 S.Ct. at 865, 87 L.Ed. at 1319]
Justice Murphy, in his concurring opinion in Martin, cites Schneider v. Town of Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, 165:
*413 One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place [319 U.S. at 150, 63 S.Ct. at 867, 87 L.Ed. at 1321]
Applying this principle to the case before the court, one cannot help but agree that there is no substitute for door-to-door communication.
The Martin case concerns itself with safeguards and states that door-to-door canvassing may be reasonably regulated as to time, number and identification of canvassers. These regulations will protect the privacy and safety of the homeowner and yet preserve the substance of free speech.
* * * The fact that some regulation may be permissible, however, does not mean that the First Amendment may be abrogated. * * * Freedom of religion has a higher dignity under the Constitution than municipal or personal convenience. [319 U.S. at 151, 63 S.Ct. at 867, 87 L.Ed. at 1321]
In Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), a company-owned town sought to ban the distribution of literature of Jehovah's Witnesses. A direct conflict existed between an individual's First Amendment rights and the right of the owners of the town to prohibit the exercise of these rights. Justice Black explained:
Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of these who use it. * * * When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position. * * * In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a State statute. [326 U.S. at 506, 66 S.Ct. at 278, 90 L.Ed. at 268-270.]
*414 Justice Frankfurter, in his concurring opinion stated:
* * * Title to property as defined by State law controls property relations; it cannot control issues of civil liberties which arise precisely because a company town is a town as well as a congeries of property relations. * * * [326 U.S. at 511, 66 S.Ct. 281, 90 L.Ed. at 271]
Thus, the principle emerged that, when determining whether property is public, the court will look at constitutional law rather than the law of property. Wolin v. Port of New York Authority, 392 F.2d 83 (2 Cir.1968).
In Hall v. Commonwealth, 188 Va. 72, 49 S.E.2d 369 (1948), a regularly ordained minister of Jehovah's Witnesses was convicted of unlawful trespass. The minister and others entered a 12-story apartment building and were informed by the attendant at his desk that they could not go upstairs unless they complied with the rule regulating the calls of all visitors. Disregarding the attendant, the parties went upstairs to distribute their tracts. Some of the tenants complained to the management and shortly thereafter the minister was arrested, charged and convicted.
In Hall every visitor who entered the building was required to stop at the desk in the lobby and have the clerk announce his arrival to the tenant. The effect of that rule was that the tenant determined whether or not the visitor was allowed to call. The court stated:
The object of the regulation adopted by the Prestwould corporation with the acquiescence of the tenants is to secure the safety, comfort, convenience, and privacy of all tenants. * * * The attendant in the lobby is made the servant  the doorkeeper  of each tenant. * * * Each householder and not the owner exercises the right to determine whether he will receive the visitor, be he an acquaintance or a stranger. [at 373]
Previous cases have upheld the rights of individuals "to go upon the streets and to go from house to house and knock upon the doors abutting on the streets, in order to enable them to distribute their (evangelical) literature."
*415 These rights were upheld in cases where the streets and abutting houses were privately owned by a corporation. However, no court has yet ruled that an individual has "any Constitutional right to go beyond the streets and into the abutting houses against the wishes of the owners or occupants." Hall, supra, at 377.
Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), held, in its relevant part, that a municipal ordinance prohibiting canvassers or peddlers from calling at private residences unless requested or invited by the individual occupant to do so, does not, as applied to solicitors of magazine subscriptions, unconstitutionally abridge freedom of speech and press. The court distinguished Martin v. City of Struthers, supra, saying:
As no element of the commercial entered into this free solicitation and the opinion was narrowly limited to the precise fact of the free distribution of an invitation to religious services, we feel that it is not necessarily inconsistent with the conclusion reached in this case. [341 U.S. at 643, 71 S.Ct. at 933, 95 L.Ed. at 1249]
Using the same reasoning as the Supreme Court, this court believes that it can distinguish the case at hand from Breard, supra, in that the present case involves defendants who were not engaged in commercial activity. It appears that persons endeavoring to disseminate political or religious information are protected by the Constitution, but those wishing to canvass an area for business purposes must yield to other considerations. The Supreme Court in Breard states that freedom of speech is not an absolute right, but must be adjusted to the rights of others. That right must yield whenever the attempt to exercise it is solely for the purpose of commercial profit.
This court believes that decisions relating to municipalities are equally applicable to Rossmoor, since it is in many essential regards a self-sufficient community. The corporate officers may speak for the citizens of Rossmoor on matters relating to health, welfare and safety. These officers may believe *416 that it is their duty to protect the Rossmoor residents from annoying or obnoxious sales methods, but the court cannot allow the corporation to decide to bar what it knows to be a bona fide political endeavor.
In Breard, supra, the court quoted from Martin, supra, stating:
Freedom to distribute information to every citizen whenever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved. [341 U.S. at 643, 71 S.Ct. at 933, 95 L.Ed. at 1248]
Although the guaranties of free speech and free press will not be used to force a community to admit peddlers or solicitors of publications to the homes of its residents, Breard, supra, such guaranties should be used to insure that each individual alone decides what political and religious information he wishes to receive.
This court is bound by legal principles reiterated by the United States Supreme Court. In applying these principles to the instant case the court feels that defendants were exercising a legal right in a legal manner and therefore were not trespassers. This court does not wish to open wide the gates of Rossmoor and thereby allow anyone to come in, at anytime, for any purpose. Nevertheless, this court feels compelled to hold ajar the gates of Rossmoor under the present circumstances. To hold otherwise would, in effect, create a political "isolation booth."
The nine complaints are therefore dismissed and counsel for defense will submit the appropriate order for judgment.