STATE OF HAWAII, Plaintiff-Appellee, *v.*
RODNEY J. MARLEY, NOBLE L. BECK, JR.,
GERARD A. LEPAGE, JOHN JOSEPH WITECK,
JAMES N. WALKLEY, DOROTHY N. KATZ, BETTE
G. JOHNSON and SUSAN M. ATHERTON,
Defendants-Appellants, and FRED STEVEN
RADFORD, Defendant.

No. 5234

May 4, 1973

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON AND KOBAYASHI, JJ.

452

OPINION OF THE COURT BY ABE, J.

The defendants-appellants (hereafter referred to as defendants) in this case—Susan M. Atherton, Noble L. Beck, Bette G. Johnson, Dorothy N. Katz, Gerard A. LePage, Rodney J. Marley, James A. Walkley, and John J. Witeck—were convicted of criminal trespass on the premises of the Honolulu office of the Honeywell corporation. The convictions, following a jury trial in Circuit Court on October 5, 6, 7 and 8, 1971, resulted in sentences of fine (in all instances partially suspended) and of jail (in all instances suspended).

The significant facts are as follows: On May 14, 1971, at approximately 2:00 o'clock p.m., the defendants entered on the premises which served as the Honolulu office of the Honeywell Corporation. One of the defendants, Rodney J. Marley, who was then A.W.O.L. from the United States Navy, read to the Honeywell staff a statement concerning the corporation's participation in the Indochina war. The other defendants established a "sanctuary" in the Honeywell office for the A.W.O.L. sailor and hoped, thereby, to stop the alleged "war crimes" being committed by Honeywell. Defendants hung pictures on the office walls, and engaged in other activities including singing and talking among themselves. The activities of the defendants were disruptive of the normal business operations of the corporation, but were completely nonviolent. After approximately three hours, at about 5:00 o'clock p.m., Mr. Paulk, Honeywell's local office manager, read a statement to the defen-

dants asking them to leave at closing time or face the charge of trespass. Since the defendants chose to remain and not depart as requested, the police were summoned, and defendants were arrested.

At their trial, the defendants and the state introduced a considerable amount of factual testimony about the Honeywell Corporation and its Honolulu office. Throughout the trial defendants contended that they were justified (under several theories, *infra*) in being on the premises of the Honolulu office, because, as was stipulated at trial, Honeywell manufactured "anti-personnel" weapons used in Indochina. Evidence was undisputed that none of these weapons was produced at the Honolulu office, but rather that the Honolulu office dealt chiefly with the computer business of the Honeywell Corporation. However, evidence was conflicting about the extent to which these computers actually played a part in the hostilities in Indochina. It was undisputed that the Honeywell Corporation was a major defense contractor doing an annual business of many millions of dollars with the United States Government.

At the conclusion of the prosecution's case, defendants' motion for acquittal was denied. At that time, defendants offered the testimony of an expert witness, Dr. Fried. The court refused to admit the testimony. During the trial, defendants offered several exhibits for introduction into evidence, but the exhibits were excluded. The trial court also refused to give, *verbatim*, many of the instructions to the jury proposed by defendants. Throughout the trial defendants were permitted, and encouraged, to give testimony both as to their motivations in their actions on the day of their trespass as well as to their beliefs about the nature of the activity carried on by the Honeywell Corporation and the nature of their beliefs about their rights and duties with respect to that corporation. Verdicts of guilty were returned, judgments were entered accordingly, and sentences were

imposed. Defendants have appealed from the judgments and sentences.

## I

Defendants first present the issue of the constitutionality of Hawaii's criminal trespass statute, HRS § 771-1 (now repealed), under which defendants were convicted.[1] Although this matter was not actually raised during defendants' trial, the policy of this court, as stated in *State* v. *Bunn*, 50 Haw. 351, 440 P.2d 528 (1968), is to deviate from the rule that appellate courts will not consider questions which were not raised in the trial court, whenever it "is necessary to serve the ends of justice or to prevent the denial of fundamental rights", 50 Haw. at 355, 440 P.2d at 532. Since this case, like *State* v. *Bunn*, involves an important constitutional issue that affects defendants' fundamental rights, we will notice the alleged constitutional defect and consider it.

Defendants challenge HRS § 771-1 as vague, indefinite, and overbroad on its face. The portions of the statute that defendants argue to be vague, indefinite, and overbroad are the phrases (a) "of another" and (b) "without right". These phrases allegedly fail to provide sufficient notice of the limits of the statutory reach in relation to defendants' constitutional privileges to exercise First Amendment rights on public property, quasi-public property, and/or private property. By allegedly failing to provide adequate notice of the extent and occasions for potential criminal liability, the defendants contend that they are denied due process of law by the statute

---

[1]The now repealed HRS § 771-1 provided, in pertinent part:

§ 771-1 *Trespass; penalty.* Whoever, *without right,* enters or remains in or upon the dwellinghouse, buildings, or improved or cultivated *lands of another* or the land of another about or near any buildings used for dwelling purposes, after having been forbidden to do so by the person who has lawful control of such premises, either directly or by notice posted thereon . . . shall be fined not more than $250, or imprisoned not more than three months, or both; . . . [emphasis added].

Unless otherwise stated, the designation herein "HRS § 771-1" refers to the above repealed statute.

and that the statute is therefore unconstitutional. *See, e.g., Connally* v. *General Construction Co.,* 269 U.S. 385 (1926); *Grody* v. *State,* 278 N.E.2d 280 (Ind. 1972) and the decisions of this court *State* v. *Abellano,* 50 *Haw.* 384, 441 P.2d 333 (1968), and *State* v. *Grahovac,* 52 Haw. 527, 480 P.2d 148 (1971).

We do not agree with defendants. This court has recently had occasion to consider the constitutionality of HRS § 771-1, albeit in another context. In *State* v. *Jordan,* 53 Haw. 634, 636, 500 P.2d 560, 563 (1972), this court adopted the analysis of *Hurley* v. *Hinckley,* 304 F. Supp. 704, 709 (D. Mass. 1969), *aff'd sub. nom., Doyle* v. *O'Brien,* 396 U.S. 277 (1970), which construed a remarkably similar provision of Massachusetts statutory law.[2] In *Hurley* v. *Hinckley, supra,* and *State* v. *Jordan, supra,* defendants were convicted of criminal trespass after failure to depart from the premises "of another" after having been given oral notice to do so. The convictions were upheld on appeal. Insofar as defendants here contend that their convictions must be overturned because of the unconstitutionality of HRS § 771-1, we disagree under our holding in *State* v. *Jordan, supra.*

(a) The phrase "of another". The only substantial distinction between the *Hurley* and *Jordan* cases and the instant case for the purposes of considering the constitutionality of HRS § 771-1 is that the instant case involves trespass to private property, while *Hurley* and *Jordan* involved trespass to public property. This distinction cuts against the defendants. In *State* v. *Jordan,* we held that a man of common intelligence could readily understand that the phrase "property of another" includes public property used by an agency of the state, even

---

[2]Massachusetts General Laws, chapter 266, sec. 120:

Whoever, *without right,* enters or remains in or upon the dwelling house, buildings . . . or improved or enclosed *land . . . of another,* after having been forbidden so to do by the person who has the lawful control of said premises, either directly or by notice posted thereon, shall be punished by a fine . . . [emphasis added].

though the general public also has certain rights to use that property. *State* v. *Jordan,* 53 Haw. 634, 636-7, 500 P.2d 560, 563. In the instant case, then, the property of the Honeywell Corporation, which is private property, is *a fortiori* encompassed within the terms of the statute. If it is obvious to a man of common intelligence that public property is covered, it is yet more evident that private property is also included in the purview of HRS § 771-1.

(b) The phrase "without right". The defendants also contend that the statute is void for vagueness, over-breadth, and indefiniteness for its failure to draw certain important legal distinctions that would adequately give notice that they may "with right" use the property "of another" in certain circumstances.

Defendants cite a string of cases in which the courts have permitted a limited exercise of First Amendment rights on certain types of property, in part because that property was sufficiently "public" in nature for those in control thereof to lose the Fifth Amendment property rights on which they had relied in excluding those who desired to use the property for the exercise of their First Amendment rights. *Marsh* v. *Alabama,* 326 U.S. 501 (1946) (wholly owned company town); *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.,* 391 U.S. 308 (1968) (privately owned shopping center generally open to the public); *Wolin* v. *Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968), *cert. denied* 393 U.S. 940 (bus terminal); *In re Hoffman,* 67 Cal. 2d 845, 434 P.2d 353, 64 Cal. Rptr. 97 (1967) (privately owned Los Angeles railroad station); *In re Lane,* 71 Cal. 2d 872, 457 P.2d 561, 79 Cal. Rptr. 729 (1969) (privately owned sidewalk in front of a supermarket open to the public); *Brown* v. *State of Louisiana,* 383 U.S. 131 (1966) (public library); *State* v. *Kolcz,* 114 N.J. Super. 408, 276 A.2d 595 (1971) (privately owned retirement village "in many essential regards a self-suf-

ficient community", 276 A.2d at 599) ; *Edwards* v. *South Carolina,* 372 U.S. 229 (1963) (site of the state government). Defendants then contend that because HRS § 771-1 does not make distinctions between public, quasi-public, and private property, it is void for vagueness and indefiniteness in that it does not advise citizens that in certain limited circumstances, exercise of First Amendment rights on the premises "of another" is constitutionally permissible. Hence defendants have no knowledge from the statute as to where and when they have the limited privilege to exercise "with right" their First Amendment rights.

Even assuming *arguendo* that the statute is subject to attack for its indefinite and vague notice provisions, we are puzzled as to the basis on which defendants feel that they have been harmed thereby. The failure of the statute to advise defendants that they may exercise First Amendment rights, at certain times at locations *other than* Honeywell's private property, is not a defect that they have standing to complain of in this particular appeal. Courts are not to "anticipate a question of constitutional law in advance of the necessity of deciding it." *Steamship Co.* v. *Emigration Commissioners,* 113 U.S. 33, 39 (1885) ; *Abrams* v. *Van Schaick,* 293 U.S. 188 (1934). One who would challenge the constitutional validity of a statute must show that as applied to him the statute is invalid. *Tileston v. Ullman,* 318 U.S. 44 (1943). Constitutional rights may not be vicariously asserted. *Alderman* v. *United States,* 394 U.S. 165, 174 (1969).

Defendants have no standing to assert their theory of the vagueness of the statute, because, whatever may be the position of others convicted under HRS § 771-1 and not now before this court, the statute's terms clearly covered *this* case. There is no vagueness here on which *these* defendants can rely. Under the view taken herein[3]

---

[3] See Part II.

defendants clearly had no constitutional right to be present in these circumstances on Honeywell's private property. Whatever may be the vagueness of the statute with regard to other persons and other properties, the matter is not reached here. We see little reason to deal with hypothetical situations.[4]

Defendants' contention that the statute is overbroad must also fail. The statute cannot be overbroad because it does not purport to, and actually does not, attempt to regulate activities protected by the First Amendment. The type of protest presented in this case involved defendants' conduct and actions as well as defendants' speech. Defendants' conduct and action are amenable to reasonable regulation by the state. As in *State* v. *Jordan, supra,* we note that "we are not today dealing with 'pure speech' " and therefore, "appellant's right to protest is not absolute". 53 Haw. 634, 638, 500 P.2d 560, 564. Moreover, we held in the *Jordan* case that the phrase "without right" implicitly includes not only the rights derived from ownership or authoritative control of the property but also other constitutional rights of the parties. 53 Haw. at 637, 500 P.2d 563-4. Here, as in *Jordan,* we have found no intimation that the party invoking the criminal trespass statute did so in a discriminatory manner to prevent the exercise of free speech. As construed, then, the phrase "without right" in the statute is certainly not unconstitutionally overbroad, because not all conduct connected with pure speech is constitutionally protected by the First Amendment. Since such conduct is amenable to reasonable regulation by the state, and this statute is such reasonable

---

[4]We note parenthetically that the necessity for discussion of the constitutionality of the criminal trespass statute here at issue is reduced even further by the repeal of the statute by L. 1971, c. 180, § 1, effective June 4, 1971, only a couple of weeks after defendants did the acts from which criminal liability arose. As noted, *infra,* defendants had the "benefit" of having the crime defined as including a "knowledge" element, as in L. 1971, c. 180, § 1, set out in note 5. Moreover, even L. 1971, c. 180, § 1 has been repealed by L. 1972, c. 9, § 1, § 3, and replaced with still different provisions.

regulation, the constitutional objection of overbreadth is insubstantial.

(c) Defendants, in a related contention, also propound the theory that the statute is vague and indefinite, as well as overbroad, because it fails to make "knowledge" an element of the offense. In contrast to the criminal trespass statute in force at the time of trial[5] the statutory provision under which defendants were convicted did not provide, on its face, that conviction for trespass required that defendants "knowingly enter" the premises.

Once again we cannot discern how defendants were injured by the alleged statutory defect, here the omission of the knowledge requirement. There is no suggestion that defendants did not know where they were or what they were doing. In fact, defendants have reiterated that their actions in sitting-in at the Honeywell office were deliberate and planned; once present there is no suggestion that defendants did not know that they were unwelcome on the premises, certainly after closing time. The element of "knowledge" required is the knowledge (of the defendants) that they were violating the terms of the statute in taking the action that they did and that they intended to take that action. *United States* v. *Moylan*,[6] 417 F.2d 1002, 1004 (4th Cir. 1969), *cert. denied* 397 U.S. 910 (1970).

Moreover, however, "knowledge" be defined, the

---

[5] HRS § 771-1, am. L. 1971, c. 180, § 1 read, in pertinent part:

(1) Whoever knowingly enters or remains unlawfully in the dwelling-house or buildings of another used for dwelling purposes, shall be fined not more than $1,000, or imprisoned not more than one year, or both.

(2) Whoever knowingly enters or remains in or upon premises which are enclosed in a manner designed to exclude intruders or are fenced, shall be fined not more than $500, or imprisoned not more than 30 days, or both.

(3) Whoever knowingly enters or remains unlawfully in or upon premises shall be fined not more than $500.

[6] In the *Moylan* case, which interpreted statutes with explicit requirements of "wilfulness" or "knowledge", the court rejected any contention that good motive or sincere belief in a sufficient affirmative justification defense was relevant in determining "knowledge" or "wilfulness."

failure of a statute to provide for knowledge as an element of a crime does not *ipso facto* render a statute unconstitutional. For not only are there statutory crimes without any requirement of intention or knowledge[7], but, as we noted in *State* v. *Taylor,* 49 Haw. 624, 636-7, 425 P.2d 1014, 1022 (1967), the applicable test for vagueness and overbreadth, which we adopted from *Boyce Motor Lines* v. *United States,* 342 U.S. 337, 340-1 (1952), is not a checklist of requirements but is far more general. The test is that:

> A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.

Finally, the trial court actually recognized a knowledge element in the crime of trespass. In its Instruction 5, the court informed the jury that it must find

> that the defendant[s], after having been unequivocally forbidden to remain upon the premises, intentionally continued to remain upon the premises thereafter.

The court thus construed the statute of criminal trespass as containing a knowledge requirement. Since the knowl-

---

[7] *See, for example,* L. 1972, c. 9, § 1, sec. 1217 (open lewdness), sec. 871 (reckless false advertising), sec. 741 (incest).

edge requirement established by these instructions is substantially identical to the knowledge requirement as authoritatively defined in *United States* v. *Moylan, supra,* defendants' constitutional argument totally fails.

HRS § 771-1 is clearly constitutional.

## II

Defendants also contend that the *application* of the trespass statute in this case was unconstitutional. We cannot agree. The recent holding of *Lloyd Corporation, Ltd.* v. *Donald M. Tanner,* 407 U.S. 551, 92 S.Ct. 2219 (1972) definitively disposes of defendants' contentions that our trespass statute was unconstitutionally applied in this case. The holding of the *Lloyd* case can be simply stated: where there has been no dedication of privately owned and operated property to the use of the public, and in the absence of a showing of discriminatory intent in invocation of trespass statutes or ordinances to curtail asserted First Amendment rights of others than the property owner, even where the attempted assertion of First Amendment rights is nondisruptive, there is no constitutional error in the use of a trespass statute or ordinance to prefer the rights of private property owners over the asserted First Amendment rights of others, providing that the subject matter about which First Amendment rights are sought to be invoked is unrelated to the nature of, or business activity conducted on, the premises of the private property.

The defendants contend that the evidence introduced at the trial (concerning the activity of Honeywell's Honolulu office, and its intimate concern with the computers that are used in the Indochina war) sufficiently demonstrates that there is a clear and close relationship between the business activity in the Honolulu office and the subject matter concerning which the defendants exercise their First Amendment rights, so that even under the *Lloyd* decision the defendants would be constitutionally

protected from trespass conviction. We need not be concerned with this disputed factual question because we find no indication whatsoever in the record that the Honeywell offices are "quasi-public" even to the extent of the relevant premises (a shopping center) involved in the *Lloyd* case. Unlike the premises used by a shopping center, the Honeywell offices are open to the public for a very limited purpose only. As noted by the Supreme Court, there must be an accommodation between the First Amendment rights of protesters and the Fifth and Fourteenth Amendment rights of private property owners. *Lloyd, supra* at 2228. Where, as here, the degree of relationship between the Honolulu office's business activities and the subject matter of defendants' protest is unclear and the essentially private nature of the Honolulu office is manifest, we have no trouble in striking the balance in favor of the property owners, especially given the facts that there was no showing of discriminatory motive or intent on the part of Mr. Paulk in asking the defendants to leave following closing time, and that in remaining after closing time the defendants' activities (unlike even the activities in the *Lloyd* case) were intended to be, and were, disruptive.

On the other hand, if it is the contention of the defendants that the statute has been unconstitutionally applied because defendants were privileged to exercise their First Amendment rights on the premises of Honeywell under the rules of law expressed in the *Marsh, Wolin, Hoffman, Lane, Brown, Kolcz* and *Edwards* cases, all *supra,* then defendants are also in error and misconstrue the holdings of those important cases. Defendants have repeatedly referred to the Honeywell Corporation as a "quasi-public" corporation and its premises as "quasi-public" property. Evidence was introduced at trial to show that Honeywell is one of the major United States defense contractors, having defense sales of many millions of dollars annually. But it has never been held

that the carrying on of even massive amounts of business activity with the government converts a private corporation into something called a "quasi-public" corporation. Furthermore, the business offices of the Honeywell Corporation cannot be analogized to the enterprises or activities in the *Marsh, Wolin, Hoffman, Lane, Brown, Kolcz,* and *Edwards* cases. The Honeywell offices are neither an appendage of the government (as in *Brown* and *Edwards*), nor the premises of a public corporation (as in *Wolin*) nor, as we have noted, are the premises open to the general public for general business purposes (as in *Lane*), and neither do the premises serve any public functions (as in *Marsh* and *Hoffman*) or have a nature similar to a municipality or self-sufficient community (as in *Kolcz*). We decline to extend the holdings of these cases to cover disruptive forms of the exercise of free speech in the offices of a private corporation, even when the corporation does a substantial amount of business with the government.

## III

We now turn to the defendants' contentions that they were denied their rights to a fair trial. The first of the defendants' complaints is that it was prejudicial error for the trial court to have excluded the proffered testimony of Dr. Fried, who was an expert in international law, the compiler of a fourteen volume set of materials on the Nuremberg Trials (and a consultant to the judges at those trials), and also a consultant to the Defense Department. Dr. Fried would have given expert testimony as to the contents of The Hague Convention on War on Land,[8] The London Agreement for the Punishment of the Major War Criminals of the European Axis (Charter of the International Military Tribunal),[9] and

---

[8]October 18, 1907 [1910] 36 Stat. 2277, T.S. No. 539, Supplemented by Geneva Convention (Note 10).

[9]August 8, 1945, 59 Stat. 1544, E.A.S. 472.

the Geneva Convention Relative to the Protection of Civilian Persons in Time of War.[10] Dr. Fried would also have testified as to his opinion as to the relevance and interpretation of other aspects of international law,[11] and he would have testified that the weapons made by Honeywell were criminal.

(a) We do not believe that the exclusion of Dr. Fried's testimony violated the applicable rules of evidence. The defendants contend that they are entitled to have the jury hear testimony concerning the contents of the relevant "international law" on which defendants rely, and in addition that they are entitled to have the jury hear testimony concerning the *application* of this law to this case. The rule of law defendants suggest is that the complexities and intricacies of international law require expert testimony for clarification. However, the mere complexity or intricacy of legal issues or rules of law is not reason for abandoning the black letter rule that the *court* finds the law and instructs the jury thereon. In Hawaii there is also a statutory requirement that the court find the law. HRS §§ 635-11, -15, -16, -17 and -52.

Defendants contend that there is an exception to this rule created by the United States Supreme Court and cite *Black Diamond S. S. Corp.* v. *Robert Stewart & Sons,* 336 U.S. 386 (1949) and *Slater* v. *Mexican Nat. R.R. Co.,* 194 U.S. 120 (1904) for the proposition that "international law" is subject to proof by expert testimony. The *Black Diamond* and *Slater* cases, however, involved Belgian and Mexican *internal* law, respectively. In this appeal, defendants rely on *American* law, made by treaties to which the United States is a party. Where the law involved is our own, mere complexity does not re-

---

[10]August 12, 1949 [1956] 6 U.S.T. 3516, T.I.A.S. 3365 (in force subject to a reservation and statement).

[11]Defendants particularly cite "The Draft Rules of Air Warfare" (1923) and "The Nuremberg Principles of 1946" ["Principles of International Law Recognized in the Charter of the Nuremberg Tribunal and in the Judgment of the Tribunal as Formulated by the International Law Commission," June and July, 1950].

quire, or even permit, the court to abdicate from its own duty of finding the law and instructing the jury thereon.

(b) We also do not believe that Dr. Fried's testimony was essential to a legal defense that defendants could have established. The American rule, in this regard, is crystal clear. All courts, including state courts, take judicial notice of American treaties, *Butschkowski* v. *Brecks,* 94 Neb. 532, 143 N.W. 923 (1913). The trial court took such judicial notice in this case, for the court, in chambers, read the testimony that Dr. Fried would have given had he been allowed to testify, and also talked personally to Dr. Fried, in chambers. Moreover, it is evident that the court noticed the relevant treaty law and applied it to this case by its instructions to the jury, setting forth one of the defenses asserted by defendants.[12] Instruction 25 charged the jury that:

> Article VI of the Constitution of the United States provides that the Constitution and the Laws of the United States and all Treaties made under the authority of the United States shall be the Supreme Law of the Land.
>
> The United States has entered into treaties which prohibit as war crimes the use of weapons which cause unnecessary and indiscriminate injuries or death to noncombatant civilians, whether done by persons singly or in cooperation with others.
>
> You are further instructed that under law, an individual citizen or citizens may use reasonable means to prevent, or seek the prevention, of the commission of a crime only if such crime is being committed, or is about to be committed in such citizen's or citizens' presence.
>
> Instruction 24 makes clear the import for defendants

[12]The defense asserted is the justification defense of the prevention or termination of a crime, see Part IV (b).

of Instruction 25 with regard to a second defense asserted by defendants[13] to wit:

> [I]n this case, if you find from the evidence that a defendant honestly believed that he or she had a right to remain upon the premises occupied by Honeywell, Inc., even after being instructed to leave, and that such belief was based upon reasonable grounds, and that the conduct of such defendant would have been lawful and proper had the facts been as such defendant honestly believed them to be, then you must find such defendant not guilty.

It is evident that the court fulfilled its function by its Instructions 24 and 25, and that Dr. Fried's testimony was neither necessary nor required. The jury had adequate and sufficient instruction on the application of treaty law to this case. The defendants presented to the jury ample evidence as to their own beliefs about the applicable law, as to their beliefs about the nature of Honeywell's business, and as to their beliefs about the legality of that business. From the guidance provided by the instructions quoted, *supra,* and from the factual information presented at trial, including a summary made by one of the defendants as to the treaty provisions on which she relied,[14] the jury could have acquitted the defendants, without Dr. Fried's testimony. The jury chose not to do so. Since we hold that the jury could not have acquitted defendants on the grounds of other asserted defenses, for other reasons,[15] Dr. Fried's testimony

---

[13]The defense asserted is the justification defense commonly called "mistake of law." See Part VI (b) .

[14]Hague Convention on War on Land, October 18, 1907 [1910] 36 Stat. 2277, T.S. No. 539; supplemented by Geneva Convention, *infra,* Articles 23 (b) , (c) , 25, 27. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949 [1956] 6 U.S.T. 3516, T.I.A.S. 3365 (in force subject to a reservation and statement) , Articles 16, 18. The defendant, as witness, was also permitted to summarize other aspects of "international law" on which she relied: Draft Rules of Air Warfare (1923) , Article 22 and "Nuremberg Principles of 1946", Principles I, II, IV, VI (b) , VI (c) , and VII.

[15]See Part VI (a) on asserted defense of right and duty to be present

was not essential to a legal defense that defendants had a right to establish.

## IV

Defendants complain that it was error for the trial court to have denied several of their draft instructions.[16]

The substance of the defense instructions was incorporated in the court's Instructions 24 and 25, *supra*. Nevertheless, defendants insist that court's Instructions 24 and 25 were inadequate because (a) the court's instructions failed to state that treaty law *and* "international law" take precedence over Hawaii state statutes and because (b) the instructions incorrectly state that crimes (here: war crimes) must be committed in the "presence" of defendants.

(a) The court's instructions were not inadequate for failure to state that "international law" takes precedence over Hawaii state statutes, because "international

without invitation, Part V on the "necessity defense", and Part IV on the inadequacy of the asserted justification defense of the prevention or termination of a crime.

[16]These are the instructions that were denied by the court:

Defendant's Instruction 2: "The United States Constitution is binding on the courts of the State of Hawaii."

Defendant's Instruction 3: "Treaties ratified by the United States are binding on the State of Hawaii."

Defendant's Instruction 4: "The Hague Convention of 1907 prohibits weapons which inflict unnecessary suffering."

Defendant's Instruction 5: "The Geneva Convention of 1949 prohibits the bombardment of hospitals, undefended towns and villages, and the murder of civilians protected by the Convention."

Defendant's Instruction 6: "Those who aid and abet in the commission of a crime are as guilty as those who actually commit it."

Defendant's Instruction 7: "Under the law of this state, one may use reasonable force to prevent, or seek to prevent, the commission of a serious crime."

Defendant's Instruction 9: "One of the issues in this case is whether the business being carried on by Honeywell, the occupant of the property, was a lawful business. In order to determine whether the business carried on by Honeywell was 'lawful' you would be required to determine whether the business of Honeywell violated any provision of law. The word 'law' includes the following and with the first two of a higher precedence than the third.

"1. The Constitution of the United States.

"2. All treaties made under the authority of the United States.

"3. The statutes of the State of Hawaii."

law" takes precedence over state statutes in only limited situations. The general rule has been established by *Skiriotes* v. *State of Florida,* 313 U.S. 69, 72-3 (1941):

> International law is a part of our law and as such is the law of all States of the Union [citation omitted] but it is a part of our law for the application of its own principles, and these are concerned with international rights and duties and not with domestic rights and duties.

The *Skiriotes* decision further noted that, therefore

> the United States is not debarred by any rule of international law from governing the conduct of its own citizens ... 313 U.S. at 73

even outside the territorial limits of the nation

> when the rights of other nations or their nationals are not infringed. With respect to such an exercise of authority there is no question of international law, but solely of the purport of the municipal law which establishes the duty of the citizen in relation to his own government. 313 U.S. at 73.

The court also then held that if the United States can control the conduct of its citizens outside the territorial limits of the nation there was no reason why a state might not likewise govern the conduct of its citizens outside the territorial limits of its borders "with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress" 313 U.S. at 77. *Skiriotes* covers this case. Since we have already held that the State of Hawaii has a legitimate interest in the conduct of persons within its jurisdiction, we have no difficulty in holding that their conduct is amenable to reasonable state regulation, regardless of "international law." For if such conduct can be regulated even outside the borders of the state and nation, it follows *a fortiori*

that such conduct may be regulated within state borders, regardless of "international law".

The matter of the applicable treaties to which the United States is a signatory presents a different problem. Self-executing treaties entered into by the United States are part of the law of the United States and of every state. Such treaties may and do affect individual rights and prevail over contrary state law, *Clark* v. *Allen,* 331 U.S. 503 (1947) , and as such are enforceable by state courts. We find that the trial court's instructions adequately presented to the jury the relevant principles derived from American treaty law and the application of those principles to defendants' trial. It is not required that the court expatiate at length, as in defendants' instructions, about the relevant treaty law or about its role in the general legal system. Instruction 25, *supra,* established that all treaties were the supreme law of the land, and it also embodied the substance of the treaty law on which defendants relied. Defendants are entitled to a fair trial, and we believe that they were accorded such a trial. *State* v. *Haffa,* 246 Iowa 1275, 71 N.W.2d 35 (1955) ; *cert. denied,* 350 U.S. 914 (1955) ; *State* v. *Case,* 247 Iowa 1019, 75 N.W.2d 233 (1956) .

(b) Defendants also object that the court's instructions are inadequate because Instruction 25 stated that the crimes that defendants claim to have acted to stop must have been committed in their "presence." Defendants' instruction on the matter has no "presence" requirement. See Defendants' Instruction 7, *supra.* We conclude that the court, and not the defendants, has stated the applicable rule of law.

Reasonable action, even if technically a violation of criminal statutes, if taken to prevent or terminate the commission of a crime by another, is, in certain circumstances, completely defensible. Such action is immune from criminal punishment as one of the "justification" defenses for otherwise criminal conduct. One of the

requirements for the particular justification defense on which defendants rely has always been that the criminal act that defendants seek to prevent or terminate must be committed in defendant's presence. LaFave and Scott, *Criminal Law* (1972), p. 406. The basis of the general rule is firmly founded on case law, chiefly presenting problems of the use of force. Defendants' nonviolent conduct presents us with essentially undecided questions of law, *i.e.,* whether the absence of force in the defendants' acts, or, indeed, the disparity in seriousness between the defendants' conduct and Honeywell's alleged crime, are distinctions of sufficiently significant importance to merit a deviation from the general rule that the criminal act sought to be prevented or terminated must occur in the presence of defendants.

Prevention or termination of the commission of a crime is only one of several "justification" defenses. Some of the others are self-defense, defense of another, and defense of property. Each of these justification defenses obviously and inevitably requires that the criminal act to be counteracted occur in the presence of the actor. A presence requirement is the concomitant of the "immediate harm" requirement. The inevitable requirement of presence stands, even where the criminal acts done to prevent harm to self, others or property do *not* involve force. Failure of the courts to require presence would license persons to violate the criminal statutes far more frequently. Such license is to be given only in exceptional cases, and even when given is to be severely limited to matters of intimate personal concern. Where the limiting factor of intimate personal concern is absent from the surrounding circumstances, as here, we see no reason to expand the scope of the justification defense. To rule that a full justification defense to the prosecution for commission of crime is established even absent a presence requirement would be to create a very dangerous precedent, for it would make each citizen a judge of

the criminality of all the acts of every other citizen, with power to mete out sentence.

The only limitation that defendants can suggest as a control of such untoward consequences is that the acts to be exonerated be nonviolent and/or less serious than those allegedly to be prevented or terminated. It is evident that these new limiting requirements to replace "presence" are insufficient to prevent the development, under the new suggested rules, of a vigilante society.

Defendants alternatively contend, however, that even if "presence" be required for the justification defense of prevention or termination of crime, sufficient "presence" is shown by the fact that radio and television broadcasts, as well as newspaper stories and news films, daily present defendants with evidence of Honeywell's alleged crimes. To find the presence requirement met by the uncertainties of the news media dissemination of information varies precious little in consequences from a total abolition of the presence requirement. As we have rejected the latter, we must reject the former. Both are prescriptions for government by vigilantes.

## V

Defendants appear to argue that they should be exonerated for criminal trespass for another reason. They claim that the "necessity defense" applies to their actions. It is evident that defendants misunderstand the defense.

The "necessity defense", which is another of the justification defenses, has sometimes been called the "choice of evils" defense. The latter phrase is very descriptive of the defense, yet fails to include, even by implication, all of its elements. Several of the crucial elements of the "necessity" or "choice of evils" defense are absent from this case, and thus it is impossible for defendants to rely on the defense to exonerate them.

In essence, the "necessity" defense exonerates persons who commit a crime under the "pressure of circum-

stances", if the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from the defendants' breach of the law. The defense is not effective in the following situations:

(1) Where there is a third alternative available to to defendants that does not involve violation of the law, defendants are not justified in violating the law. LaFave and Scott, *Criminal Law,* p. 387; *Bice* v. *State,* 109 Ga. 117, 120, 34 S.E. 202, 203 (1899); *United States* v. *Holmes,* 26 F. Cas. 360, 367 (No. 15,383) (C.C. Pa. 1842). Other forms of noncriminal protest were and are available to defendants to enable them to dramatize, and hence hopefully terminate, conduct which they may view are harmful.

(2) A closely related required element is that the harm to be prevented be imminent. Where, as here, the harmful acts to be prevented by defendants' actions were, at best, only tenuously connected with the situs of the crime, and would be only tenuously affected by defendant's acts, we cannot find any real "necessity" for defendants to act.

(3) Thirdly, and most importantly, even assuming *arguendo* that alternative courses of action were "unavailable" (perhaps because ineffective) or that there was some strong connection between the Honeywell office in Honolulu and the allegedly criminal acts that defendants sought to prevent, such connection being significant enough to establish the requisite degree of immediacy or imminence of the greater harm to be prevented, defendants remain unentitled to the defense of "necessity" because their actions were not reasonably designed to actually prevent the threatened greater harm. In *United States* v. *Simpson,* 460 F.2d 515, 518 (9th Cir. 1972), the court stated: "An essential element of the so-called justification defenses is that a direct causal relationship be reasonably anticipated to exist between

the defender's action and the avoidance of harm". Under any possible set of hypotheses, defendants could foresee that their actions would fail to halt Honeywell's production of the war material, the production of which defendants assert to be a war crime. Since no reasonable man could find otherwise, it was not error for the judge to have omitted an instruction on the "necessity defense".

## VI

Defendants make one other major contention. They urge that it was error for the court to fail to give an instruction to the effect that their failure to attempt to stop the allegedly criminal acts of Honeywell would render them liable under American treaty law to prosecution, and that avoiding this potential liability was a justification for their criminal trespass. As a basis for the asserted defense, defendants attempted to show that Honeywell's acts were in fact criminal under American treaty law; for this reason defendants insisted that the criminality of Honeywell's acts was itself a major issue. The state asserted that the exonerating belief required of defendants was that *the defendants'* own action in sitting-in at Honeywell was honestly and reasonably seen to be legal, and that the absence of any reasonable basis for defendants to believe that *their own* action was legal deprived them of this justification defense. We agree with the state. We find it unnecessary to consider whether the Honeywell Corporation is, or is not, a war criminal. Even assuming that Honeywell is a war criminal, the applicable law does not give these defendants either a right or a duty to be present without invitation on the Honeywell premises.

(a) The Nuremberg defenses have been raised in several instances recently in American courts as proferred excuses for alleged criminal acts. In cases in which the defendants had a status similar to the defendants in this case, it has been consistently held that defendants lacked

standing to raise arguments that the statute under which they were indicted was inconsistent with international law, or that any inconsistency permitted them to violate statutory provisions with impunity.

It is true that an American citizen can sometimes be tried in American courts for violations of the law of war. *Ex parte Quirin,* 317 U.S. 1, 27-8 (1942). It has also been said that individuals can be punished for violations of international law. *The Nurnberg Trial,* 6 F.R.D. 69, 110. Two justices of the United States Supreme Court have stated that at some point members of the Armed Forces sent for combat duty in Vietnam should be permitted to raise issues involving international treaty obligations. Dissents of Stewart and Douglas, JJ., *Mora* v. *McNamara,* 389 U.S. 934-39 (1967).

But the courts have not permitted the raising of treaty obligation issues by a soldier, in an action for injunction after being ordered to Vietnam. *Mora* v. *McNamara,* 128 U.S. App. D.C. 297, 387 F.2d 862, *cert. denied* 389 U.S. 934 (1967). Nor have treaty obligations been a defense to criminal prosecution for failure to submit to induction. *United States* v. *Valentine,* 288 F. Supp. 957 (D. Puerto Rico, 1968). As a basis for an action for injunction after induction, treaty obligations were again declared beyond the purview of legal principles assertable by the movant party. *Luftig* v. *McNamara,* 126 U.S. App. D.C. 4, 373 F.2d 664 (1967), *cert. denied,* 387 U.S. 945 (1967). And in *United States* v. *Berrigan,* 283 F. Supp. 336 (D. Md. 1968), *cert. denied,* 397 U.S. 909 (1970), it was held that since the defendants were not in the military service in Indochina, they did not have the necessary status to raise, as a defense to a criminal prosecution, legal principles of treaty law similar to those relied on by defendants in this case.

The most commonly given reason for the above holdings is that it is generally improper for the judiciary to

decide "political questions" of the sort presented by reliance on a theory that one's own government violates its own treaty obligations. In addition, it would seem that mere membership in the Armed Forces does not, under any circumstances, create criminal liability under the treaty law on which defendants here rely; nor do conspiracy doctrines reach individual members of the Armed Forces not in Indochina so as to give rise to criminal liability. *United States* v. *Valentine*, 288 F. Supp. 957, 987 (D. Puerto Rico 1968). The Nuremberg Military Tribunals established nothing to the contrary. *Id.*[17]

---

[17]The defendants-appellants cite *United States* v. *Altstoetter* (popularly known as the Justice Case); *United States* v. *Flick*, and *United States* v. *Krauch* (known as the I. G. Farben Case), *Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10* and seem to contend that under these authorities they might be subjected to prosecution as war criminals if they did not show their opposition and attempt to stop the United States war efforts in Vietnam. The cases, contrary to their contention, hold that only persons in the political, military, and industrial fields, who are responsible for the formulation and execution of policies, may be liable for waging wars of aggression. The cases make clear that the concept "war criminal" does not include the citizen of a country who supports and aids the war efforts of his government, as a "private soldier in the battlefield, the farmer who increased his production of foodstuffs to sustain the armed forces, or the housewife who conserved fats for the making of munitions." The concept does not make the entire manpower of a country answerable for waging wars of aggression and does not provide for mass punishments. I. G. Farben Case, volume 8, pp. 1124-25.

See also, Cohen, *Civil Disobedience: Conscience, Tactics, and the Law* (1971), pp. 208-9:

Now indirect disobedients, too, are likely to argue that they face a moral choice. Suppose they are horrified by their nation's foreign policy, and elect to violate a trespass law in protest. Having, as they believe, an obligation to make their revulsion clear, they choose this limited but dramatic way to do so. Doing so is indeed their choice, and is morally motivated, but nevertheless the Nuremberg argument cannot defend them. For the key question is whether that moral choice is forced upon them by the law they disobeyed. Would obedience, rather than disobedience, under the given circumstances, have in any way implied participation in or approval of the international crimes being perpetrated (as the disobedient believes) by his own government? Clearly, for indirect disobedience it would not. Obedience to trespass laws, traffic laws, and the like, indicates neither approval nor disapproval, tacit or explicit, of a nation's foreign policy or military conduct. While a citizen may have an obligation to make his moral position clear, he cannot be said to have an obligation, under Nuremberg principles, to do so by breaking laws that themselves have nothing to do with the moral issues in dispute. Of course a man may *choose* to exhibit his moral revulsion by such

With regard to seven of the eight defendants here, we find frivolous any contention that they were legally obligated to act to avoid criminal liability. The case of the eighth defendant, the A.W.O.L. sailor is more difficult. But in light of the *Mora, Valentine,* and *Luftig* cases, we hold that, *in this situation,* he has no standing to raise, as a defense, alleged violations, by Honeywell, of American treaty law. In light of our holding, we find that, since defendants had no valid defenses arising from treaty law that are assertable by them against the operation of a valid state statute reasonably regulating conduct, it was not error for the court to omit to charge the jury concerning this claimed "justification defense." It is essential *for the rights of the parties before the court to be violated before the defense becomes assertable. United States* v. *Berrigan,* 283 F. Supp. 336, 341 (D. Md. 1968), *cert. denied,* 397 U.S. 909 (1970).

(b) It is true that reasonable mistake of law is often a complete defense to the charge of criminality for an act when the mistake of law negatives a mental state which must be shown to establish a material element of the crime. *People* v. *Rosen,* 11 Cal. 2d 147, 78 P.2d 727 (1938) ; *People* v. *Shaunding,* 268 Mich. 218, 255 N.W. 770 (1934) ; *cf.* L. 1972, c. 9, § 1-220. Therefore, defendants' "honest" and "reasonable" belief that they had a right or duty to be present on Honeywell property, in that they had a defense assertable under American treaty law—no matter how incorrect such a belief might be—

---

deliberate indirect disobedience, and there may be much to say . . . for and against the ultimate justifiability of such disobedience. But the Nuremberg principles, even if of recognized authority, cannot there apply. By the nature of the case, the circumstances under which indirect civil disobedience takes place do not compel the moral choice between participation and nonparticipation (or approval and disapproval) that Nuremberg principles might conceivably protect. Indirect disobedience almost invariably is practiced in situations carefully selected or created by the protester; he decides upon the law he will break, and how he will break it, as the instrument of his protest. In such situations the Nuremberg principles—quite apart from all other difficulties of their application—could not govern.

would have exonerated defendants by negativing the mental state that is an essential element of the crime. Instruction 24, *supra*, given by the court enunciated the gist of this defense. The jury could have acquitted the defendants on this instruction, even though defendants disclaimed any reliance on a "mistake" of law justification defense. The jury chose not to do so.

## VII

Defendants also present two minor contentions, both without merit.

(a) Defendants contend that the court should have granted their motion for acquittal because the prosecution failed to present proof of one of the elements of the crime, *i.e.*, that defendants were present "without right." Under the view of HRS § 771-1, taken by this court in *State* v. *Jordan*, 53 Haw. 634, 638, 500 P.2d 560, 564 (1972), continued unauthorized physical presence on the lands of another (after a request to depart made by the persons in control of the property) constitutes violation of the statute. When, as here, the prosecution shows these facts, it has established a *prima facie* case. Affirmative defenses[18] are the burden of the defendants. Since these had not yet been presented when a motion for acquittal was made under Rule 29, Hawaii Rules of Criminal Procedure, it was proper for the judge to deny the motion.

(b) Defendants also argue that the trial court erred in its refusal to admit certain defense exhibits. The exhibits in question were documents that listed the extent of Honeywell's participation in the manufacture of "anti-personnel" weapons. Defendants contend that these documents were necessary to their demonstration that they had a reasonable belief that Honeywell was a war criminal. Since the issue of Honeywell's criminality does not

---

[18]See Parts IV, V, VI.

affect defendants' right to be present without permission on Honeywell property,[19] there was no error in the trial judge's refusal to admit these exhibits into evidence. Immaterial and irrelevant evidence is to be excluded. HRS § 635-16.[20] In addition to exclusion for irrelevancy and immateriality, the evidence could also be excluded because it was excessively lengthy and cumulative. There was no error.

In our decision today we do not express or intimate any opinion on the criminality of the Honeywell Corporation. We do not reach this issue. We decide only that HRS § 771-1 is constitutional as written and as applied, and that defendants received a fair trial leading to their conviction for violation of that particular criminal statute.

Affirmed.

*Richard Turbin,* Deputy Public Defender (*Donald Tsukiyama,* Public Defender, with him on the briefs), for defendants-appellants *Rodney J. Marley* and *Gerard A. Lepage.*

*John J. Witeck, Dorothy M. Katz, Bette G. Johnson, Susan M. Atherton* each in propria persona (*Noble J. Beck, Jr.,* and *James N. Walkley* with them on the briefs) defendants-appellants.

*Michael A. Weight,* Deputy Prosecuting Attorney (*Barry Chung,* Prosecuting Attorney, with him on the brief), for plaintiff-appellee.

---

[19]See Parts IV, V, VI.

[20]§ 635-16 *Duty of court.* The court shall control all proceedings during the trial, and limit the introduction of evidence and the argument of counsel to *relevant and material matters,* with a view to the expeditious and effective ascertainment of the entire truth regarding the matters involved [emphasis added].